No. 16-2417

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

CYNTHIA ARCHER,

*Plaintiff-Appellant*,

v.

JOHN CHISHOLM, DAVID ROBLES, BRUCE LANDGRAF,
ROBERT STELTER, DAVID BUDDE, AND AARON WEISS,

*Defendant-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 2:15-cv-00922-LA
The Honorable Lynn Adelman

---

## Appellant's Opening Brief

---

Krista K. Baisch
James B. Barton
HANSEN REYNOLDS
DICKINSON CRUEGER LLC
316 North Milwaukee St.,
  Suite 200
Milwaukee, WI 53202
Phone: (414) 326-4941
kbaisch@hrdclaw.com

David B. Rivkin, Jr.
Mark W. DeLaquil
Richard B. Raile
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
drivkin@bakerlaw.com

*Attorneys for Plaintiff-Appellant*
*Cynthia Archer*

## Disclosure Statement

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the undersigned counsel of record for Appellant Cynthia Archer hereby certifies that Baker & Hostetler LLP and Hansen Reynolds Dickinson Crueger LLC are the only law firms whose attorneys have appeared for Ms. Archer in this case and that Ms. Archer has no parent or affiliate corporation.


Dated August 2, 2016                    /s/ David B. Rivkin Jr.
                                        David B. Rivkin Jr.
                                        Baker & Hostetler LLP
                                        1050 Connecticut Ave., N.W., Suite 1100
                                        Washington, D.C. 20036
                                        (202) 861-1731
                                        drivkin@bakerlaw.com

**Disclosure Statement**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the undersigned counsel for Appellant Cynthia Archer hereby certifies that Baker & Hostetler LLP and Hansen Reynolds Dickinson Crueger LLC are the only law firms whose attorneys have appeared for Ms. Archer in this case and that Ms. Archer has no parent or affiliate corporation.


Dated August 2, 2016                    /s/ Mark W. DeLaquil
                                        Mark W. DeLaquil
                                        Baker & Hostetler LLP
                                        1050 Connecticut Ave., N.W., Suite 1100
                                        Washington, D.C. 20036
                                        (202) 861-1527
                                        mdelaquil@bakerlaw.com

## Disclosure Statement

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the undersigned counsel for Appellant Cynthia Archer hereby certifies that Baker & Hostetler LLP and Hansen Reynolds Dickinson Crueger LLC are the only law firms whose attorneys have appeared for Ms. Archer in this case and that Ms. Archer has no parent or affiliate corporation.

Dated August 2, 2016

/s/ Richard B. Raile
Richard B. Raile
Baker & Hostetler LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1711
rraile@bakerlaw.com

## Disclosure Statement

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the undersigned counsel for Appellant Cynthia Archer hereby certifies that Baker & Hostetler LLP and Hansen Reynolds Dickinson Crueger LLC are the only law firms whose attorneys have appeared for Ms. Archer in this case and that Ms. Archer has no parent or affiliate corporation.

Dated August 2, 2016

/s/ Krista B. Baisch
Krista B. Baisch
Hansen Reynolds Dickenson Crueger LLC
316 North Milwaukee St., Suite 200
Milwaukee, WI 53202
(414) 326-4941
kbaisch@hrdclaw.com

## Disclosure Statement

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the undersigned counsel for Appellant Cynthia Archer hereby certifies that Baker & Hostetler LLP and Hansen Reynolds Dickinson Crueger LLC are the only law firms whose attorneys have appeared for Ms. Archer in this case and that Ms. Archer has no parent or affiliate corporation.


Dated August 2, 2016           /s/ James B. Barton
                               James B. Barton
                               Hansen Reynolds Dickenson Crueger
                               LLC
                               316 North Milwaukee St., Suite 200
                               Milwaukee, WI 53202
                               (414) 326-4941
                               jbarton@hrdclaw.com

# Table of Contents

Introduction ........................................................... 1

Jurisdictional Statement ............................................. 2

Statement of the Issues ............................................. 3

Statement of the Case................................................ 4

   A. Parties............................................................... 4

   B. Cynthia Archer Associates with Scott Walker and
   Advocates for His Policies ........................................ 5

   C. Appellees Agree To Retaliate Against Mr. Walker's
   Associates ........................................................... 6

   D. Appellees Carry out Their Retaliatory Mission.................... 8

   E. Appellees Target Archer for Retaliation ......................... 10

   F. The John Doe Judge Fails To Review the Warrant
   Affidavit ............................................................ 12

   G. Appellees Execute the Warrant and Interrogate Ms.
   Archer .............................................................. 14

   H. Appellees' Investigation into the Walker
   Administration Continues........................................... 15

   I. Appellees' Bad-Faith Investigation Injures Ms. Archer.......... 17

   J. Ms. Archer Seeks To Vindicate Her Civil Rights ................ 18

Summary of Argument................................................ 20

Standard of Review.................................................. 22

Argument ........................................................... 22

   I. Ms. Archer Adequately Pleaded That Appellees
   Violated Her Clearly Established First Amendment
   Rights .............................................................. 22

      A. Ms. Archer Adequately Pleaded a Claim for a
      Retaliatory Criminal Investigation.................................. 22

         1. A Constitutional Tort for First Amendment
         Retaliation Is Clearly Established in the Criminal
         Investigation Context ................................................ 23

i

2. Ms. Archer Engaged in Activity Protected Under the First Amendment.................................................. 25

3. Ms. Archer Was Deprived of Her Constitutional Rights ................................................................. 30

4. Appellees Were Motivated To Violate Ms. Archer's Rights As a Result of Her First Amendment-Protected Activity.................................... 31

5. Appellees Lacked Probable Cause To Investigate Ms. Archer................................................... 32

B. Ms. Archer's Retaliatory Arrest Claim Was Also Dismissed Incorrectly................................................ 41

C. Ms. Archer's Conspiracy Claim Should Be Reinstated ................................................................. 41

II. Ms. Archer Adequately Pleaded That Appellees Violated Her Clearly Established Fourth Amendment Rights ............................................................... 41

A. The John Doe Judge Was Not a Neutral and Detached Magistrate ................................................. 42

B. The Appellees Lacked Probable Cause To Search Ms. Archer's Home.................................................. 43

C. The Warrant for the Search of Ms. Archer's Home Was Not Particularized ............................................. 44

D. The Scope of the Search of Ms. Archer's Home Was Unlimited .................................................... 48

E. The District Court's Decision Dismissing the False Arrest Claim Should Be Reversed ............................... 49

III. Prosecutorial Immunity Does Not Apply ......................... 50

A. The Prosecutors' Acts in John Doe I Were Investigative ................................................... 50

B. The Prosecutors Are Not Immune for Their Role in Obtaining Warrants ................................................ 54

C. Prosecutors Can Be Liable Under Section 1983 for the Actions of Their Subordinates ............................... 55

IV. The Anti-Injunction Act Bars the District Court's
Injunction of the *Three Unnamed Petitioners* Decision................................. 56

Conclusion .................................................................................................. 61

# Table of Authorities

## CASES

*Abbott v. Sangamon County, Illinois*, 705 F.3d 706 (7th Cir. 2013) ..................................................................... 25

*Acevedo v. Canterbury*, 457 F.3d 721 (7th Cir. 2006) ..................................... 49

*Allen v. McCurry*, 449 U.S. 90 (1980) ............................................................. 59

*Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001) ........................................ 23

*Andresen v. Maryland*, 427 U.S. 463 (1976) ........................................ 46, 48, 49

*Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009) ............................................... 30

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) ........................................... 32

*Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281 (1970) ..................................................... 57, 58

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ........................ 22, 42

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ....................... 23, 24, 30, 31

*Betker v. Gomez*, 692 F.3d 854 (7th Cir. 2012) ............................................... 43

*Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016) ............................. 49, 50, 51

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) .................................................. 30

*Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009) ............................................ 28

*Buckley v. Fitzsimmons*, 509 U.S.259 (1993).............................................*passim*

*Buckley v. Valeo*, 424 U.S. 1 (1976)................................................................ 27

*Burns v. Reed*, 500 U.S. 478 (1991) ........................................................... 54, 55

*Chrzanowski v. Bianchi*, 725 F.3d 734 (7th Cir. 2013) .................................... 30

*Craig v. Chicago Police Officers*, No. 05 C 0172, 2005 WL 1564982 (N.D. Ill. June 9, 2005)...................................................... 34

*Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937 (7th Cir. 2015)............................................................. 34

*Dawson v. General Motors Corp.*, 977 F.2d 369 (7th Cir. 1992).......................... 5

*Design Basics LLC v. Campbellsport Building Supply Inc.*, 99 F. Supp. 3d 899 (E.D. Wis. 2015)................................................. 38

*Dye v. Office of Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012)........................ 26

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)......................................50, 51

*Florida v. Royer*, 460 U.S. 491 (1983)............................................................ 49

*Franks v. Delaware*, 438 U.S. 154 (1978) ...................................................... 43

*Gacy v. Welborn*, 994 F.2d 305 (7th Cir. 1993) ............................................. 24

*Gann v. Cline*, 519 F.3d 1090 (10th Cir. 2008)............................................... 26

*Garcetti v. Ceballos*, 547 U.S. 410 (2006).................................................*passim*

*Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003) ................................. 30

*Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976 (N.D. Ill.
2009)................................................................................................ 36

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012)................................. 5

*General Electric Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997) ................................................ 22, 35, 38

*Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995) .......................................... 55

*Glober v. Mabrey*, 384 F. App'x 763 (10th Cir. 2010) ..................................... 32

*Groh v. Ramirez*, 540 U.S. 551 (2004) .......................................................44, 47

*Gupta v. Owens*, No. 12 C 7855, 2014 WL 1031471
(N.D. Ill. Mar. 18, 2014) ..................................................................... 35

*Harman v. Pollock*, 446 F.3d 1069 (10th Cir. 2006) ....................................... 49

*Hartman v. Moore*, 547 U.S. 250 (2006) ........................................24, 32, 33, 51

*Heath v. Varity Corp.*, 71 F.3d 256 (7th Cir. 1995) ......................................... 24

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ..................................... 38

*Heidelberg v. Illinois Prisoner Review Board*,163 F.3d 1025 (7th
Cir. 1998) ......................................................................................... 52

*Heideman v. Wirsing*, 7 F.3d 659 (7th Cir. 1993)............................................ 26

*Hernly v. United States*, 832 F.2d 980 (7th Cir. 1987)..................................... 60

*Hessel v. O'Hearn*, 977 F.2d 299 (7th Cir. 1992)............................................ 48

*Hill v. City of New York*, 45 F.3d 653 (2d Cir. 1995) ...................................53, 54

*Hill v. Martin*, 296 U.S. 393 (1935).............................................................. 58

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ..................................................... 50

*In re Application of Lafayette Academy*,
  610 F.2d 1 (1st Cir. 1979) .................................................. 44

*In re Doe*, 766 N.W.2d 542 (Wis. 2009).......................................... 53

*In re Grand Jury Proceedings*, 716 F.2d 493 (8th Cir. 1983)............................. 45

*In re Morgan Stanley Information Fund Securities Litigation*, 592
  F.3d 347 (2d Cir. 2010) ...................................................... 34

*Izen v. Catalina*, 382 F.3d 566 (2d Cir. 2004)................................... 24

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000).................................. 23

*Jenevein v. Willing*, 493 F.3d 551 (5th Cir. 2007) ........................................ 29

*Johnson v. Collins*, 5 F. App'x 479 (7th Cir. 2001)....................................23, 24

*Juriss v. McGowan*, 957 F.2d 345 (7th Cir. 1992) .............................. 39, 40, 43

*Knox v. Smith*, 342 F.3d 651 (7th Cir. 2003) ................................................. 34

*KRL v. Moore*, 384 F.3d 1105 (9th Cir. 2004)................................................ 53

*Lacey v. Maricopa County*, 649 F.3d 1118 (9th Cir. 2011) ................................ 24

*Lamon v. Sandidge*, 232 F. App'x 592 (7th Cir. 2007) ..................................... 34

*Landstrom v. Illinois Department of Children & Family Services*,
  892 F.2d 670 (7th Cir. 1990)................................................. 29

*Leavey v. City of Detroit*, 719 F. Supp. 2d 804 (E.D. Mich.
  2010) ........................................................................ 28

*Levenstein v. Salafsky*, 164 F.3d 345 (7th Cir. 1998)....................................... 35

*Levy v. Pappas*, No. 04 C 6498, 2006 WL 1994554 (N.D. Ill.
  July 13, 2006) .............................................................. 23

*Lewis v. Mills*, No. 09-CV-2090, 2009 WL 3669745 (C.D. Ill.
  Nov. 3, 2009)............................................................... 28

*Lucas v. Turner*, 725 F.2d 1095 (7th Cir. 1984).............................................. 60

*Malley v. Briggs*, 475 U.S. 335 (1986).....................................................44, 49

*Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363 (7th Cir.
  1997)........................................................................ 34

*McBeth v. Himes*, 598 F.3d 708 (10th Cir. 2010)............................................ 32

*McMillan v. Collection Professionals, Inc.*, 455 F.3d 754 (7th
  Cir. 2006) .................................................................. 34

*Michigan v. Summers*, 452 U.S. 692 (1981) ..................................................... 49

*Moore v. Hartman*, 644 F.3d 415 (D.C. Cir. 2011) ......................................... 33

*Moore v. Hartman*, 704 F.3d 1003 (D.C. Cir. 2013) ....................................... 33

*Morfin v. City of East Chicago*, 349 F.3d 989 (7th. 2003) ................................ 41

*Munafo v. Metropolitan Transportation Authority*, 285 F.3d 201
      (2d Cir. 2002) ..................................................................................... 28

*Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.*, 309 U.S.
      4 (1940) ............................................................................................. 58

*Ornelas v. United States*, 517 U.S. 690 (1996) ................................................ 34

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ....................................... 55

*Pendleton v. St. Louis County*, 178 F.3d 1007 (8th Cir. 1999) .......................... 24

*Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015) .............................................. 23

*Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d
      574 (7th Cir. 1999) ............................................................................. 44

*Poolaw v. Marcantel*, 565 F.3d 721 (10th Cir. 2009) ....................................... 49

*Power v. Summers*, 226 F.3d 815 (7th Cir. 2000) ............................................ 30

*Price v. Roberts*, No. 10–1574, 2011 WL 1877823 (W.D. Pa.
      May 16, 2011) ..................................................................................... 27

*Protectoseal Co. v. Barancik*,
      23 F.3d 1184 (7th Cir. 1994) .............................................................. 22

*Rakovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988) .................................... 23, 24

*Reichle v. Howards*, 132 S. Ct. 2088 (2012) ................................................... 41

*Rickert v. Sweeney*, 813 F.2d 907 (8th Cir. 1987) ........................................... 44

*Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*,
      424 F.3d 659 (7th Cir. 2005) .............................................................. 26

*Rogers v. Stem*, 590 F. App'x 201 (4th Cir. 2014) .......................................... 40

*Saunders v. Duke*, 766 F.3d 1262 (11th Cir. 2014) .......................................... 36

*Scherr v. Marriott International, Inc.*, 703 F.3d 1069 (7th Cir.
      2013) .................................................................................................. 37

*Skoog v. County of Clackamas*, 469 F.3d 1221 (9th Cir. 2006) ................... 32, 33

*Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892 (7th Cir. 2001) ............................................................... 52

*Socialist Workers Party v. Grubisic*, 619 F.2d 641 (7th Cir. 1980) ...................................................................................... 60

*Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004) ...........................23, 31

*Smith v. Bayer Corp.*, 564 U.S. 299 (2011) ............................... 57

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001) .......................... 24

*State v. Chvala*, 693 N.W.2d 747 (Wis. 2005) ........................... 45

*State v. Doe*, 254 N.W.2d 210 (Wis. 1977) ............................... 52

*State v. Jensen*, 681 N.W.2d 230 (Wis. Ct. App. 2004) ............... 45

*State v. Libecki*, 830 N.W.2d 271 (Wis. Ct. App. 2013) .............. 54

*State v. Simplot*, 509 N.W.2d 338 (Wis. Ct. App. 1993) ............. 40

*State v. Washington*, 266 N.W.2d 597 (Wis. 1978) ...................... 7

*State ex rel. Reimann v. Circuit Court for Dane County*, 571 N.W.2d 385 (Wis. 1997) ...................................................7, 53

*State ex rel. Three Unnamed Petitioners v. Peterson*, 875 N.W.2d 49 (Wis. 2015) .......................................................16, 17, 56, 59

*State ex rel. Two Unnamed Petitioners v. Peterson*, 866 N.W.2d 165 (Wis. 2015)...............................................16, 19, 21, 38

*Stobinske-Sawyer v. Village of Alsip*, 188 F. Supp. 2d 915 (N.D. Ill. 2002) ....................................................................... 34

*Stokes v. City of Mt. Vernon*, No. 11 CV 7675(VB), 2012 WL 3536461, at *7 (S.D.N.Y. Aug. 14, 2012) ......................... 28

*Tarpley v. Keistler*, 188 F.3d 788 (7th Cir. 1999) ...................... 28

*T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010) ........................... 55

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002)........................... 36

*Trant v. Oklahoma*, 754 F.3d 1158 (10th Cir. 2014) ................... 28

*United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980) ................ 46

*United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003) ............. 45

*United States v. Brown*, 832 F.2d 991 (7th Cir. 1987) ................. 46

*United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982)................ 44

viii

*United States v. Debbi*, 244 F. Supp. 2d 235 (S.D.N.Y. 2003)........................... 49

*United States v. George*, 975 F.2d 72 (2d Cir. 1992) ......................................... 45

*United States v. Jones*, 54 F.3d 1285 (7th Cir. 1995)......................................... 47

*United States v. Leary*, 846 F.2d 592 (10th Cir. 1988) ...................................... 44

*United States v. Leon*, 468 U.S. 897 (1984).................................................42, 43

*United States v. Matias*, 836 F.2d 744 (2d Cir. 1988) ...................................... 48

*United States v. Medlin*, 798 F.2d 407 (10th Cir. 1986) .................................... 48

*United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ........................ 49

*United States v. Neal*, 611 F.3d 399 (7th Cir. 2010)......................................... 37

*United States v. Pratt*, 438 F.3d 1264 (11th Cir. 2006) .................................... 47

*United States v. Reed*, 726 F.2d 339 (7th Cir. 1984) ........................................ 46

*United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978)....................................... 48

*United States v. Roche*, 614 F.2d 6 (1st Cir. 1980)........................................... 44

*United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986) ................................... 44

*United States v. Stefonek*, 179 F.3d 1030 (7th Cir. 1999)................................. 47

*United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)..................................... 49

*United States v. Washington*, 797 F.2d 1461 (9th Cir. 1986)............................ 45

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429
      (7th Cir. 1993) ....................................................................................... 35

*Village of Arlington Heights v. Metropolitan Housing Development
      Corp.*, 429 U.S. 252 (1977) ................................................................... 32

*VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974) ..................................... 45

*Watkins v. Kasper*, 599 F.3d 791 (7th Cir. 2010) ............................................. 28

*Wheaton College v. Burwell*, No. 1:13–cv–08910, 2014 WL
      3034010 (N.D. Ill. June 30, 2014) ......................................................... 24

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) .................................................... 24

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)................................. 25

*Wolf-Lillie v. Sonquist*, 699 F.2d 864 (7th Cir. 1983)....................................... 55

*Wright v. Associated Insurance Cos. Inc.*, 29 F.3d 1244 (7th Cir.
      1994)........................................................................................................ 37

**STATUTES**

28 U.S.C. § 1291 ................................................................................... 2

28 U.S.C. § 2283 ..............................................................................3, 57

42 U.S.C. § 1983 ........................................................................... *passim*

Wis. Stat. § 19.58 ................................................................................ 45

Wis. Stat. § 19.59 ................................................................................ 45

Wis. Stat. § 939.05 .............................................................................. 45

Wis. Stat. § 939.30 .............................................................................. 45

Wis. Stat. § 946.12 .............................................................................. 45

Wis. Stat. § 946.12(3) .......................................................................... 39

Wis. Stat. § 946.12(5) .......................................................................... 13

Wis. Stat. § 968.26(2)(am) ...............................................................7, 52

**RULES**

Fed. R. Civ. P. 9(b) ............................................................................. 32

Fed. R. Civ. P. 12(b)(6) ....................................................................... 35

Fed. R. Evid. 106 ................................................................................ 36

**OTHER**

John Chisholm, Press Release, "Milwaukee Mayor Tom
    Barrett endorses District Attorney John Chisholm"
    (July 12, 2016) ............................................................................. 7

## Introduction

Appellees targeted Plaintiff-Appellant Cynthia Archer for criminal investigation in retaliation for her political advocacy and her political affiliation with Wisconsin Governor Scott Walker. As part of their campaign to thwart Governor Walker's political career and policy agenda, Appellees orchestrated a predawn raid on Ms. Archer's home by armed officers with a battering ram, relying on a warrant that they obtained by concealing and misrepresenting evidence, that had never been meaningfully reviewed by any magistrate, and that may not even have been signed by any magistrate. They tipped off the press to embarrass Ms. Archer, ransacked her home, unlawfully detained her, and subsequently subjected her to a series of interrogations revealing their true purpose: taking down Governor Walker. Appellees' unconstitutional and unconscionable conduct devastated Ms. Archer's career and her life.

The district court's decision dismissing Ms. Archer's claims on the pleadings is riddled with errors. It disregarded Ms. Archer's well-pleaded allegations in favor of over 300 pages of extra-complaint documents, nearly all of which were secret before this case and many of which contain purposefully false, incomplete, and misleading information. It blessed retaliatory criminal investigations, so long as the targets are public servants. And it unmoored the

1

concept of prosecutorial immunity from historical precedent and from reason, holding that the existence of probable cause to investigate people *other than* Ms. Archer for crimes having no relation to her immunized the prosecutors' investigative conduct pertaining to Ms. Archer.

The decision below, if affirmed, would blow a hole through the constitutional rights of public servants like Ms. Archer, ratify egregious misconduct by public officials in their exercise of extraordinary law-enforcement power, and all but close the door on claims vindicating the right to be free from official retaliation carried out through abusive investigation. The judgment should be reversed and the case remanded.

## Jurisdictional Statement

Plaintiff-Appellant brought the instant action under 42 U.S.C. § 1983. This case was filed in Milwaukee County Circuit Court and removed on the basis of federal-question jurisdiction, 28 U.S.C. § 1331. The Decision and Order and Judgment were entered by the District Court on May 26, 2016, and disposed of all claims. Plaintiff-Appellant timely filed her Notice of Appeal on June 9, 2016. Jurisdiction is proper in the United States Court of Appeals for the Seventh Circuit based on 28 U.S.C. § 1291.

This matter is not a direct appeal from the decision of a magistrate judge. There have been no prior or related appellate proceedings in this case, nor have there been post-judgment motions filed below.

No party appears in this case in his or her official capacity.

## Statement of the Issues

1. Whether investigatory actions undertaken in retaliation for political advocacy and political affiliation that cause the victim pecuniary harm and significant emotional distress are actionable under 42 U.S.C. § 1983.

2. Whether the search of a home and the administrative detention of its occupants based on a non-particularized warrant that the defendants know was not reviewed by a neutral and detached magistrate and was supported by an affidavit that purposefully misstated material facts relevant to probable cause is actionable under 42 U.S.C. § 1983.

3. Whether prosecutors are entitled to absolute immunity for investigative conduct that did not result in any probable-cause determination because the prosecutors had probable cause to investigate other people for unrelated crimes.

4. Whether the Anti-Injunction Act bars a federal court from enjoining a state Supreme Court decision including a contingent requirement that

3

parties to federal-court litigation relinquish unlawfully seized materials, where the parties would need to seek state-court approval before using those materials in the federal litigation.

## Statement of the Case

### A.    Parties

Plaintiff-Appellant Cynthia Archer is a career public servant who has spent decades in Wisconsin government. Between 2006 and 2011—when Defendants leaked to the media that she was under secret criminal investigation—Ms. Archer was a political appointee in the administrations of Scott Walker. Appendix, A18, ¶¶ 16–18.

The Defendant-Appellees are the District Attorney of Milwaukee County, John Chisholm, two of his assistant district attorneys, David Robles and Bruce Landgraf (sometimes, the "Prosecutor-Appellees"), and three investigators in his office, David Budde, Robert Stelter, and Aaron Weiss (sometimes, the "Investigator-Appellees"). The position of district attorney is an elected office, and Mr. Chisholm has campaigned as a member of the Democratic Party. A22, ¶ 36. Mr. Chisholm hired and promoted the other Appellees based on their shared partisan views. A22, ¶¶ 37–38. For example, Mr. Robles was a member of an anti-Walker Facebook group. A24, ¶ 49. Mr. Budde displayed a recall Walker sign at his home. A24, ¶ 49. And Mr.

4

Landgraf was identified by a state-court judge in open court as abusing his prosecutorial power for partisan purposes. A30, ¶ 82.

## B.    Cynthia Archer Associates with Scott Walker and Advocates for His Policies

Ms. Archer has spent decades in various positions in Wisconsin state and local government, typically in Republican administrations. A18, ¶¶ 14–15. In 2006, then-Milwaukee County Executive Scott Walker hired her as a budget director for the Milwaukee Department of Administrative Services. A18, ¶ 16. Mr. Walker relied on her to carry out his policy agenda, and, in 2008, appointed her as Director of Administrative Services. A18, ¶¶ 17–18.

As Director of Administrative Services, Ms. Archer was effectively third-in-command in Milwaukee County and was instrumental in developing and implementing Mr. Walker's policy agenda. A19, ¶ 19. She advocated for Mr. Walker's policies within the County government, including before the County Board of Supervisors and in published editorials.[1] Appellees knew of Ms. Archer's political affiliation with Mr. Walker and her advocacy in support of his policies. A19, ¶ 22.

---

[1] The district court dismissed Ms. Archer's claims on the pleadings with prejudice. On appeal, Ms. Archer has presented additional facts that are consistent with her pleadings to illustrate what facts could be alleged in a new amended complaint. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992).

When Mr. Walker became governor of Wisconsin, he invited Ms. Archer to join his transition team and appointed her Deputy Secretary of Administration, placing her among the highest echelon of government officials in the state. A19–20, ¶¶ 23–24. Her appointment was due to her political affiliation with Mr. Walker and her prior experience in supporting, advocating for, and implementing his policy agenda. A20, ¶ 25.

As part of the Walker administration, Ms. Archer played a lead role in crafting and advocating in favor of 2011 Wisconsin Act 10, A20, ¶ 27, a controversial bill reforming public-sector union bargaining, A21–22, ¶¶ 31–35. Ms. Archer assumed this role because of her commitment to Governor Walker's agenda; it was not inherent in her duties as Deputy Secretary of Administration. A20, ¶ 27. Defendants knew that Ms. Archer played a crucial role in drafting Act 10, supporting its passage, and implementing its provisions once enacted. A21, ¶¶ 29–30.

## C. Appellees Agree To Retaliate Against Mr. Walker's Associates

In 2010, County Executive Walker emerged as the leading Republican contender for Governor and Milwaukee Mayor Tom Barrett emerged as the

leading Democratic contender. Mr. Chisholm is a political ally of Tom Barrett, Scott Walker's two-time gubernatorial opponent.[2] A23, ¶¶ 40–41.

Around this time, Mr. Chisholm and the other Appellees reached an agreement to conduct a criminal investigation into Mr. Walker and his associates to harm his chances of election. A27, ¶ 66. The Appellees chose a "John Doe" proceeding as the primary, but not exclusive, vehicle for targeting Mr. Walker and his associates. The John Doe procedure is "an investigatory tool used to ascertain whether a crime has been committed and if so, by whom." *State ex rel. Reimann v. Cir. Ct. for Dane Cty.*, 571 N.W.2d 385, 390 (Wis. 1997). It provides law-enforcement officers "the benefit of powers not otherwise available to them," such as "the power to subpoena witnesses . . . and to compel the testimony of a reluctant witness." *State v. Washington*, 266 N.W.2d 597, 604 (Wis. 1978). A John Doe proceeding does not require probable cause to initiate. It can be opened or expanded if there is "reason to believe that a crime has been committed" within the jurisdiction. Wis. Stat. § 968.26(2)(am).

---

[2] Their close relationship continues to this day, with Mr. Barrett endorsing Mr. Chisholm's current re-election bid. John Chisholm, Press Release, "Milwaukee Mayor Tom Barrett endorses District Attorney John Chisholm" (July 12, 2016), *available at* http://urbanmilwaukee.com/pressrelease/milwaukee-mayor-tom-barrett-endorses-district-attorney-john-chisholm.

### D.    Appellees Carry out Their Retaliatory Mission

Appellees ostensibly relied on a year-old tip from Thomas Nardelli, Mr. Walker's Chief of Staff, to open the John Doe proceeding. A28, ¶ 70. In April 2009, Mr. Nardelli had informed Defendant Budde that a few thousand dollars had gone missing from a local charity. A28, ¶ 70. The crime was not directly connected to Mr. Walker's office—the culprit was an employee of the charity—but Mr. Walker's office had given funds to the charity. A28, ¶ 70.

Within four days of opening the investigation on the pretense of identifying the "source" of the missing funds, A28, ¶ 71, Appellees expanded the investigation to target Mr. Walker's associates in a variety of ways unrelated to the charitable funds. A29, ¶¶ 73–76. The John Doe judge was a rubber stamp for Appellees' agenda. Due to his lack of oversight, Appellees obtained orders expanding the investigation eighteen times in two years—an average of one expansion every five or six weeks. Every expansion concerned Mr. Walker or his affiliates. A33, ¶ 94. The John Doe judge allowed Appellees to obtain warrants for unlimited access to communications in the email accounts of individuals as to whom there was not even a pretense of probable cause. A29–30, ¶¶ 77–78. In particular, he did not scrutinize Appellees' legal or factual theories of wrongdoing by Ms. Archer. A36, 44–46, ¶¶ 107, 145–51.

Free from any meaningful supervision, Appellees raided homes and businesses, jailed witnesses who refused to provide incriminating testimony against Mr. Walker or his aides, seized electronic records of targets and non-targets, interrogated witnesses in secret sessions, and selectively leaked sealed information to local news outlets. A30–32, 37, ¶¶ 83–84, 90, 110. Much of this activity did not occur before the John Doe judge. *E.g.*, A31–32, ¶¶ 85–92. All Appellees played a direct role in the investigation. A31, ¶¶ 85–87.

Appellees' investigation intensified following the passage of Act 10, during the drive to recall Governor Walker and various Republican legislators. Appellees or their associates leaked secret information to the press suggesting that criminal complaints against Mr. Walker and his associates were imminent—their purpose being to influence the election. A51, ¶¶ 172–73.

By the time it had concluded, the investigation had grown into the largest in Milwaukee history, generating more records than any previous investigation in the history of the Milwaukee County District Attorney's office. Around the same time, homicides in Milwaukee rose by over 44 percent, and Mr. Chisholm publicly complained that he lacked investigative resources to pursue those cases.

### E.    Appellees Target Archer for Retaliation

Appellees first set their sights on Ms. Archer in late 2010. A35,¶ 102. Appellees knew that Ms. Archer was not involved with Mr. Walker's gubernatorial campaign, as they were simultaneously investigating Mr. Walker's campaign activities. Nevertheless, they obtained a warrant to search her County office, claiming that she had engaged in campaign work on County time in violation of Wisconsin's Misconduct in Public Office Statute. A35, ¶ 104.

During the public and political turmoil that followed the enactment of Act 10 in 2011, Appellees intensified their efforts against Ms. Archer. A36, ¶ 108. They leaked to the media that Ms. Archer was a target of their investigation. A37, ¶ 110. Mr. Stelter then applied for a warrant to search Ms. Archer's home. In the supporting affidavit, Mr. Stelter selectively quoted and misrepresented the contents of emails sent to and by Ms. Archer in order to fabricate the existence of probable cause to suspect Ms. Archer of two crimes.

The first pretextual crime was that Ms. Archer had leaked confidential information concerning a 2009 request for proposal ("RFP") for housekeeping services to bidders. Appellees had no evidence that Ms. Archer leaked information, A48, ¶ 156, and in fact identified another County Executive employee, Timothy Russell, as the source of the leaks, *id.* Yet to create the

10

impression that Ms. Archer assisted Mr. Russell, Mr. Stelter's affidavit alleged that an agent of the bidder sent an ex parte email to Mr. Russell, who "then forward[ed] the information to the attention of Cindy Archer." A429, ¶ 30(b). In fact, Mr. Stelter's sworn statement was false. As is apparent on its face, the email that Mr. Stelter represented was "forwarded" to Ms. Archer had been altered by Mr. Russell to remove any indication that it came from an alleged agent of the bidder, such that the email provided no indication that Ms. Archer was aware of the alleged agent's involvement. A477–78. Had Mr. Stelter not misrepresented this communication, the warrant affidavit would have accurately shown that Ms. Archer would have had no reason to believe that Mr. Russell, another County Executive employee, had used the 2009 RFP information for anything other than county business.

The second pretextual crime was that Ms. Archer improperly advantaged a bidder that Appellees believed Mr. Walker's office favored in a 2010 RFP process for lease of office space. But Appellees knew—based on the same documents they cited as justification for the warrant—that she opposed awarding that bidder the contract. A46–47, ¶¶ 151, 155. Lacking probable cause to investigate Ms. Archer, Appellees selectively quoted Ms. Archer's emails to misconstrue their meaning and deliberately omitted the relevant

11

information that defeated their claim to probable cause from the primary affidavit submitted in support of the warrant. A46–47, ¶¶ 151, 154, 155.

### F.    The John Doe Judge Fails To Review the Warrant Affidavit.

Although the John Doe judge generally failed to supervise the investigation, in the specific case of the warrant for the search of Ms. Archer's home, it is certain that the John Doe judge did not review the warrant affidavit in any meaningful respect, and he may not have even signed it.

The warrant for the search of Ms. Archer's home and supporting affidavit totaled 115 pages. And the affidavit incorporated by reference all affidavits, transcripts, and other materials associated with the John Doe proceeding, A405–06, 423, ¶¶ 3, 26, thus amounting to hundreds of thousands of pages of material. Any review of the warrant application would have had to occur early on the day of September 13, 2011, as Mr. Stelter's affidavit was sworn that day and the warrant application was approved by the John Doe judge in Milwaukee that day at 1:10 pm, giving the judge (at most) a couple of hours to review this voluminous application.

But there is no indication that the judge spent any time on it. The time sheets the John Doe judge submitted to the state reported that he did not work on the John Doe investigation at all between September 10 and September 15,

2011, and billed no travel to Milwaukee on those days.[3] The John Doe judge submitted the time sheets "under penalties of perjury," and swore that "no portion of this claim was provided free of charge." (Providing such services free of charge likely would have itself violated Wisconsin law, Wis. Stat. § 946.12(5), and would be punishable as a Class I felony.) Indeed, public records indicate that the judge was engaged on another matter in another county, at least 30 miles away, on September 13, 2011. That engagement precludes the possibility that he traveled to Milwaukee; reviewed the warrant, affidavit, exhibits, and incorporated documents; and signed the warrant, all before 1:10 in the afternoon.

The John Doe judge may not have even signed the warrant. The signature on the warrant affidavit for the search of Ms. Archer's home appears sufficiently unusual that a forensic analyst retained by Appellant was unable to confirm that the signature on the warrant is, in fact, the judge's from the documents currently available.

Appellees knew that the judge did not review the warrant and know whether he is actually the one who signed it. In fact, Defendant Robles

---

[3] John Doe Judge Neal Nettesheim was not an active-duty judge. Instead, he was a "Reserve Judge," which is a retired judge who is assigned to certain types of matters and bills the state by the hour. Judge Nettesheim did not live in Milwaukee and submitted expenses when he traveled to Milwaukee.

purportedly notarized the judge's signature on the warrant and would know about the procedural irregularities surrounding the warrant.

### G.  Appellees Execute the Warrant and Interrogate Ms. Archer

On September 14, 2011, a dozen law-enforcement officers arrived at Ms. Archer's home with a battering ram shortly before dawn. A37–38, ¶¶ 112, 116. Mr. Weiss led the raid, and Messrs. Budde and Stelter helped orchestrate it. A37–38, ¶¶ 112–13. Defendants also tipped off a reporter about the raid, and he arrived within minutes. A39, ¶¶ 118, 121. These actions were calculated to intimidate Ms. Archer. A38–39, ¶¶ 116–20. In fact, Mr. Weiss indicated to a fellow officer that they were unlikely to obtain any relevant information not found on Ms. Archer's computers, but the officers spent hours searching every corner of the home, ransacking drawers and other locations where there was no probability of finding incriminating evidence. A40, 42, ¶¶ 125, 132. Officers took possession of every email Archer wrote or received beginning in 2006, when she was working in Green Bay, despite the fact that Appellees did not allege any criminal activity before 2009. A44, ¶ 143. Many of Ms. Archer's emails have since been made available to the public.[4] A44, ¶ 143. During the

---

[4] Some, but not all, of Archer's emails remain available online at http://johndoewalker.americanbridge.org/, in the files labeled "CArcher." For context, "CArcher-Email5" contains 11,805 pages of Archer's emails,

search, in an apparent attempt to build rapport with Ms. Archer, Mr. Weiss admitted that the investigation was political. A41, ¶ 127. The criminal investigation of Ms. Archer was the lead story on the news that evening. A43, ¶ 137.

Subsequently, Appellees questioned Ms. Archer in seven secret sessions. A49–52, ¶¶ 161–178. The John Doe judge did not preside over the interrogations, and they did not occur in a court or judicial proceeding. A50, ¶ 167. Each Appellee was personally involved in questioning Ms. Archer. A49, ¶ 163. All Appellees understood that the purpose was intimidation, A49, ¶ 164, and the sessions were designed to achieve this purpose. A49–50, ¶¶ 165, 168, 169.

## H.  Appellees' Investigation into the Walker Administration Continues

In August 2012, Mr. Stelter signed an affidavit without probable cause in support of a petition by Mr. Robles for a new Walker-related John Doe proceeding, this time targeting Mr. Walker's campaign and conservative groups statewide. A33, ¶ 95. As with John Doe I, the Appellees conducted this investigation in collaboration with the Government Accountability Board ("GAB"). Communications between certain Appellees and GAB staff evidence

---

covering July 1, 2008, through December 31, 2008, despite there being no allegation of criminal activity during that time.

15

the retaliatory motivations behind the probe. For example, when the Special Prosecutor made a public statement that Governor Walker was not a target of the investigation,[5] GAB official Shane Falk chided Mr. Schmitz for harming the campaign of Mary Burke, Governor Walker's 2014 opponent. Certain appellees were included on these communications and manifested their agreement with Mr. Falk's views through their silence.

Ultimately, the Wisconsin Supreme Court repudiated Appellees' actions. A33–35, ¶¶ 95–101. The Court identified several affidavits submitted by Mr. Stelter in support of multiple search warrants and subpoenas, *State ex rel. Two Unnamed Petitioners v. Peterson*, 866 N.W.2d 165, 181 (Wis. 2015), and concluded that they lacked probable cause, *id.* at 196, 211–12. These Appellees therefore succeeded in inflicting "a 'perfect storm' of wrongs" on Wisconsin citizens by employing "theories of law that do not exist" and "the unlimited resources of an unjust prosecution" in order "to investigate citizens who were wholly innocent of any wrongdoing." *Id.* at 211–12. The Wisconsin Supreme Court enjoined any further investigative activities. *Id.*

---

[5] The Prosecutor-Appellees collaborated with the Special Prosecutor in this investigation and, in fact, originated and pursued if for a year before the John Doe II Special Prosecutor was (unlawfully) appointed. *See State ex rel. Three Unnamed Petitioners v. Peterson*, 875 N.W.2d 49, 55–56 (Wis. 2015).

The Wisconsin Supreme Court also ordered the return or destruction of all documents seized during the second phase of the investigation (i.e., "John Doe II"). But on reconsideration, the Court ordered Appellees and the special prosecutor in that matter to turn over to the Wisconsin Supreme Court itself "all originals and *all copies* of documents and electronic data" obtained during the investigation "within 30 days following the completion of proceedings in the U.S. Supreme Court on any petition for certiorari review." *State ex rel. Three Unnamed Petitioners v. Peterson*, 875 N.W.2d 49, 58, 60 (2015) (emphasis added). The Court represented that these materials will "be available for use in related civil proceedings," including this one, "if there is a request and a determination that such use is proper under the circumstances." *Id*. at 61 The Appellees have never made a particularized request for any of this information.

## I.     Appellees' Bad-Faith Investigation Injures Ms. Archer

After the efforts to recall Governor Walker failed, the inquiries related to Ms. Archer ceased. A51, ¶ 174. No one was charged in connection with any of the pretextual inquiries used to target Ms. Archer. *Id.* But Ms. Archer's reputation was destroyed, A52, ¶ 182, she was forced to resign as Deputy Secretary of Administration, A53–54, ¶ 186, her pay was cut, *id.*, her future earning potential was impaired, A54, ¶ 188, she incurred substantial legal bills that required her to mortgage her home, A50, ¶ 166, she was harassed by

17

individuals in her community, A52–53, ¶ 183, she was ridiculed in the media and on radio, A53, ¶ 185, her personal relationships suffered, A52–53, ¶ 183, she suffered post-traumatic stress disorder, A52, ¶ 181, she continues to suffer mental distress to this day, *id.*, she fell into depression, A55, ¶ 190, she was committed to a psychiatric ward, *id.*, and she became suicidal, *id.*

## J.    Ms. Archer Seeks To Vindicate Her Civil Rights

Ms. Archer brought this action in the Circuit Court of Milwaukee County. Appellees removed to the United States District Court for the Eastern District of Wisconsin. Following removal, Ms. Archer amended her complaint and the Prosecutor-Appellees moved to dismiss, asserting prosecutorial and qualified immunity. They attached four extraneous documents to the Motion to Dismiss on which they asked the court to rely: (1) the May 5, 2010 Petition for the Commencement of a John Doe Proceeding, A389; (2) the September 13, 2011 search warrant for Ms. Archer's home and a partial copy of an accompanying affidavit, A402; (3) the remainder of the accompanying affidavit and its attachments, A431; and (4) the December 17, 2010 search warrant and accompanying affidavit for Ms. Archer's Milwaukee County office, A517. These documents were selected by Prosecutor-Appellees from the millions of pages of investigation-related documents that they possess under seal.

Following briefing on the motion to dismiss, the Investigator-Appellees filed a Motion for Judgment on the Pleadings to which they added an additional exhibit: an expansive warrant affidavit and accompanying exhibits purportedly issued on July 11, 2011. A563. Excluding duplicates, the Defendants attached 305 pages of extraneous documents to their motions on the pleadings.

The Investigator-Appellees also moved for an order enjoining them from complying with the Wisconsin Supreme Court's mandate in *Two Unnamed Petitioners* requiring the future return of material that they unconstitutionally seized during the course of the "John Doe II" investigation. Ms. Archer opposed the order as being outside the district court's jurisdiction, and the Wisconsin Attorney General filed an amicus brief opposing the motion on grounds of equity and comity.

On May 26, 2016, the district court, the Honorable Lynn Adelman presiding, granted the defendants' motions and entered final judgment dismissing Ms. Archer's claims with prejudice. The district court also granted the motion for preservation order in part by allowing the Appellees to file copies of materials ordered to be returned and/or filed with the Wisconsin Supreme Court with the clerk of the Eastern District of Wisconsin. Special Appendix, SPA39–42.

Ms. Archer filed a timely notice of appeal.

## Summary of Argument

Ms. Archer's pleadings are more than sufficient to allege plausibly that Appellees' politically motivated criminal investigation violated her clearly established First and Fourth Amendment rights. The district court's decision dismissing the action with prejudice was erroneous at every turn.

In dismissing Ms. Archer's First Amendment claims, the district court trampled thirty years of Circuit precedent holding that retaliatory investigations and arrests are unconstitutional. As a matter of both law and common sense, law-enforcement officers know that they should not abuse their governmental authority by predicating criminal investigations on partisan motives. Nothing in the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which concerns government-employer discipline for employees' speech in their governmental roles, disturbs this precedent. Nor was the district court correct in disregarding Ms. Archer's well-pleaded allegations concerning the lack of probable cause in favor of hundreds of pages of extra-complaint materials, many of which were incomplete or marked by fraud.

The district court likewise erred in dismissing Ms. Archer's Fourth Amendment search-and-seizure and false-arrest claims. In addition to the same

improper reliance on extra-complaint materials that marred its First Amendment holding, the district court's dismissal with prejudice precluded Ms. Archer from advancing her claim that the John Doe judge *did not review* the warrant application for her home and that the application contained false and misleading information. The district court also erred in accepting this information as true in contravention of Ms. Archer's right to prove that it was false through discovery. That alone is sufficient basis for reversal.

Moreover, the district court's decision to afford the Prosecutor-Appellees absolute immunity for investigatory acts towards Ms. Archer that occurred not just before, but in the complete absence of, any probable cause determination was erroneous. The district court's conclusion that the existence of probable cause in a John Doe proceeding for one crime absolutely immunizes prosecutors who spin in another direction and investigate a different person for an unrelated crime contradicts every Supreme Court and Seventh Circuit decision on point, including *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), which posit a *functional* test that turns on the existence of probable cause to charge, not on the form of proceeding.

Finally, the district court lacked jurisdiction to enjoin the Appellees from complying with the Wisconsin Supreme Court's mandate in *Two Unnamed Petitioners*. Only where absolutely necessary to preserve its jurisdiction may a

21

federal court enjoin a state-court decision. Necessity cannot be satisfied in this case for several reasons, most notably because the Appellees failed to satisfy this Circuit's requirement that they seek state-court approval on a particularized basis before using these materials in federal litigation.

For these reasons, the district court's judgment should be reversed.

## Standard of Review

This Court "review[s] a district court's grant of a 12(b)(6) motion *de novo*, accepting all of the well-pleaded allegations in the complaint as true." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).

This Court reviews the issuance of an injunction for abuse of discretion, *Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1186 (7th Cir. 1994), although "legal issues [raised by an injunction] are reviewed de novo," *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015).

## Argument

## I.   Ms. Archer Adequately Pleaded That Appellees Violated Her Clearly Established First Amendment Rights

### A.   Ms. Archer Adequately Pleaded a Claim for a Retaliatory Criminal Investigation

"To state a First Amendment claim for retaliation, a plaintiff must allege that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the

future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) (quotation marks omitted); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). To surmount qualified immunity, the constitutional right must also have been clearly established at the time the violation occurred. *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). Because a qualified immunity defense "depends on the facts of the case," it is "almost always a bad ground for dismissal" on the pleadings. *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001) (quotation marks omitted).

### 1.   A Constitutional Tort for First Amendment Retaliation Is Clearly Established in the Criminal Investigation Context

For almost three decades, this Court has consistently held that "an investigation conducted in retaliation for comments protected by the first amendment could be actionable under section 1983." *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (en banc), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004); *see also Johnson v. Collins*, 5 F. App'x 479, 485–86 (7th Cir. 2001) (characterizing this right as "clearly established"); *Levy v. Pappas*, No. 04 C 6498, 2006 WL 1994554, at *7 (N.D. Ill. July 13, 2006) ("A claim that defendants launched a criminal investigation in retaliation for

the exercise of first amendment rights is actionable under 42 U.S.C. § 1983."),
*aff'd*, 510 F.3d 755 (7th Cir. 2007). This Court's jurisprudence is consistent
with that from courts of appeals throughout the country. *See, e.g.*, *Izen v. Catalina*, 382 F.3d 566, 572 (2d Cir. 2004); *Pendleton v. St. Louis Cty.*, 178 F.3d 1007, 1010–11 (8th Cir. 1999); *Lacey v. Maricopa Cnty.*, 649 F.3d 1118, 1132 (9th Cir. 2011); *White v. Lee*, 227 F.3d 1214, 1226–29, 1237–39 (9th Cir. 2000); *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001); *Bennett*, 423 F.3d at 1248, 1250–56.

Disregarding this precedent, the district court found it "unclear whether a retaliatory investigation . . . rises to the level of a constitutional violation." It based this finding on dicta in a footnote in *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006), noting that the Supreme Court has not yet passed on the viability of a retaliatory investigation claim. SPA31. But the Supreme Court's inaction does not overrule this Court's decisions in *Rakovich* and *Johnson*, or the multitude of other circuit-court decisions that have found such claims to be actionable. Because "[f]ew predictions of change in legal doctrine come true," a district court "should apply existing precedents" of this Court as written, rather than assume that they will be overruled. *Heath v. Varity Corp.*, 71 F.3d 256, 257 (7th Cir. 1995); *Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993); *Wheaton College v. Burwell*, No. 1:13–cv–08910, 2014 WL 3034010, at *3 (N.D.

Ill. June 30, 2014) (following this Court's precedent because "nothing in [a related] Supreme Court[] ruling expressly overrules" that precedent, and "[i]t is solely the province of the Seventh Circuit to decide whether to revisit" its own precedent).

Moreover, the Supreme Court does not need to pass on the issue for the right to be clearly established; Seventh Circuit precedent is more than sufficient. *See Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) (finding right clearly established in the absence of a controlling Supreme Court precedent). And "patently obvious" constitutional violations, like Appellees' politically motivated investigation, are not entitled to immunity. *Jacobs*, 215 F.3d at 767; *see also Whitlock v. Brueggemann*, 682 F.3d 567, 586 (7th Cir. 2012). A reasonable prosecutor would know that raiding homes and interrogating citizens to harass and intimidate them for their political speech and association violates their constitutional rights.

### 2. Ms. Archer Engaged in Activity Protected Under the First Amendment

Ms. Archer sufficiently pleaded that she engaged in two types of clearly established First Amendment-protected activity: (1) political affiliation with Governor Walker; and (2) public advocacy for Governor Walker's policies, including without limitation Act 10. A19–21, 55, ¶¶ 14–30, 194.

25

**Political Affiliation.** The district court correctly acknowledged that political affiliation is a clearly established right, SPA29 n.15, the only conclusion consistent with voluminous precedent, *see, e.g.*, *Roger Whitmore's Auto. Servs., Inc. v. Lake Cty., Ill.*, 424 F.3d 659, 667–69 (7th Cir. 2005); *Heideman v. Wirsing*, 7 F.3d 659, 662 (7th Cir. 1993); *Dye v. Office of Racing Comm'n*, 702 F.3d 286, 298–99 (6th Cir. 2012); *Gann v. Cline*, 519 F.3d 1090, 1093–94 (10th Cir. 2008).

The district court's decision to nonetheless dismiss with prejudice Ms. Archer's claim on the ostensible basis that "the complaint alleges that . . . the defendants did not begin their so-called 'campaign of harassment' until Act 10's proposal" in mid-February 2011 badly misrepresents the amended complaint. SPA29 n.15. The complaint alleges that Ms. Archer was affiliated with Governor Walker and was therefore appointed to multiple political positions by him, A18–20, ¶¶ 16–24, that Appellees knew of Ms. Archer's affiliation, *id.*, that Appellees took adverse action against Ms. Archer because of her affiliation with Governor Walker, A38–52, ¶¶ 102–78, and that these adverse actions began in 2010, well before Act 10, A38, ¶ 102. Indeed, contemporary news stories confirm that it was public knowledge Ms. Archer was affiliated with Mr. Walker and his policies from at least 2009 onward. And even if the district court determined that affiliation was not sufficiently

26

alleged in the amended complaint, dismissal with prejudice was improper because Ms. Archer could amend to clarify her affiliation claim.

**Political Advocacy.** Political advocacy for public policies is also a clearly-established First Amendment protected interest. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) ("[T]he right to engage in vigorous advocacy" is a "core First Amendment" right.) (quotation marks omitted); *Tarpley v. Keistler*, 188 F.3d 788, 795 (7th Cir. 1999) ("Advocacy is inherently partisan, and the First Amendment guarantees freedom of such partisanship . . . ."). Ms. Archer alleged that Appellees retaliated against her because of her advocacy for Walker's policies, both as County Executive and Governor. A19–21, 55, ¶¶ 19, 20, 22, 25, 30, 194.

Considering only those allegations related to "the plaintiff's advocacy of Act 10" and disregarding Ms. Archer's advocacy on other policies, SPA29, the district court found that under *Garcetti*, Ms. Archer had no clearly established right to be free from retaliatory prosecution when advocating for the Act because of the absence of controlling Circuit or Supreme Court precedent. SPA30. The district court's conclusion is badly mistaken.

*Garcetti* has "nothing to do with claims of retaliatory prosecution," *Price v. Roberts*, No. 10–1574, 2011 WL 1877823, at *16 (W.D. Pa. May 16, 2011), especially "a First Amendment retaliation claim against a defendant who is not

the plaintiff's employer," *Trant v. Oklahoma*, 754 F.3d 1158, 1169 (10th Cir.

2014); *see also Lewis v. Mills*, No. 09-CV-2090, 2009 WL 3669745, at *5 (C.D.

Ill. Nov. 3, 2009) (same); *Leavey v. City of Detroit*, 719 F. Supp. 2d 804, 812

(E.D. Mich. 2010) (same); *Stokes v. City of Mt. Vernon*, No. 11 CV 7675(VB),

2012 WL 3536461, at *7 (S.D.N.Y. Aug. 14, 2012) (same).[6] Instead, *Garcetti* is

a public-employee-discharge case that concerns the "delicate balance between

a citizen's right to speak . . . and the employer's need to effectively provide

government services." *Bridges v. Gilbert*, 557 F.3d 541, 550 (7th Cir. 2009).

*Garcetti*'s limitation of employee speech rights follows from the need of

government employers to exercise "control over their employees' words and

actions." 547 U.S. at 418. Appellees are law enforcement officers who have no

need for "sufficient discretion to manage" Ms. Archer, no "heightened

interests in controlling [her] speech," no need to "ensure that" Ms. Archer's

"official communications are accurate," and no need to "promote [an]

employer's mission." *Id.* at 422–23, 434.

---

[6] Courts regularly decline to apply *Garcetti* outside the government-employee disciplinary context. The government "enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign," *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002), and less deferential standards apply to different governmental interests. *See, e.g.*, *Bridges*, 557 F.3d at 550–51 (declining to apply *Garcetti* to restrictions on prisoner speech); *Watkins v. Kasper*, 599 F.3d 791, 796 (7th Cir. 2010) (declining to apply *Garcetti* to restrictions on prisoner speech, even where prisoner is also employee of state prison).

Likewise, the district court's assumption that only controlling post-*Garcetti* precedent considering a retaliatory criminal investigation into a public employee suffices to clearly establish a right is contrary to precedent. Controlling authority is not required to defeat qualified immunity, as long as there is "sufficient consensus, based on all relevant case law, indicating that the official's conduct was unlawful." *Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 676 (7th Cir. 1990) (quotation marks omitted). There is a long line of precedent in the Seventh Circuit and elsewhere that all citizens have the right to be free from retaliatory criminal investigations. *See supra* Section I.A.1. While many of these cases pre-date *Garcetti*, the district court identified no authority (and counsel is aware of no authority) applying *Garcetti* outside the public-employee discipline and discharge context.

Even if *Garcetti* had some application to retaliatory criminal investigations, Ms. Archer is an appointed official and the *Garcetti* doctrine does not extend to such officials. *See Jenevein v. Willing*, 493 F.3d 551, 557–58 (5th Cir. 2007). Unlike civil servants, the relationship between appointed officials like Ms. Archer and the public necessarily involves public advocacy with those within and without the Walker administration.

Finally, the district court improperly adjudicated a factual dispute over whether Ms. Archer's advocacy was inherent to her position as Deputy

29

Secretary of Administration. *See, e.g.*, *Chrzanowski v. Bianchi*, 725 F.3d 734, 739 (7th Cir. 2013). *See also Garcetti*, 547 U.S. at 426 (expressly limiting holding to "expressions employees make pursuant to their professional duties"). Ms. Archer alleged that it was not, A20, ¶ 27, and the district court erred in not taking that allegation as true. *See, e.g.*, *Andrew v. Clark*, 561 F.3d 261, 268 (4th Cir. 2009) (holding that "the district court was required to accept [plaintiff's] statement as true" that activity was not part of official duties).

### 3.    Ms. Archer Was Deprived of Her Constitutional Rights

The "deprivation" element of First Amendment retaliation is satisfied by "[a]ny deprivation under color of law that is likely to deter the exercise of free speech," including "something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Cognizable deprivations have included everything from the issuance of $35 in parking tickets, *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003), to a "prolonged and organized campaign of harassment" by law-enforcement officers, *Bennett*, 423 F.3d at 1254, and the publication of confidential information regarding an investigation, *Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998).

30

The complaint alleges multiple deprivations. Appellees orchestrated a raid of Ms. Archer's home before dawn, subjecting her and her partner to humiliation by a dozen armed officers, guns drawn. A38–39, ¶¶ 115–17, 119–21. They directly or indirectly leaked this news to the press, so that Ms. Archer would be publicly suspected of criminal activity. A38, 42, ¶¶ 118, 134. They rifled through her home and possessions, seizing and retaining all her emails from 2006 to 2010, and then released them to the public. A44, ¶ 143. And they questioned Ms. Archer in secret interrogations that were calculated to harass and intimidate her. A49–52, ¶¶ 161–78. As a result, Ms. Archer suffered out-of-pocket expenses for legal bills, was forced to resign as Deputy Secretary of Administration, had her pay cut, and suffered severe mental distress. A52–55, ¶¶ 179–92. Appellees' actions constitute a deprivation that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights" and were motivated to that end. *Bennett*, 423 F.3d at 1254.

### 4. Appellees Were Motivated To Violate Ms. Archer's Rights As a Result of Her First Amendment-Protected Activity

The third element of the First Amendment retaliation tort is satisfied if the plaintiffs' speech or association is at least a substantially motivating factor in the decision to take retaliatory action. *Spiegla*, 371 F.3d at 941–42. The complaint alleges that all Appellees investigated Ms. Archer in a manner that

was intended to harass and intimidate her due to her political affiliation with Governor Walker and because of her advocacy on behalf of Act 10 and other measures. *E.g.*, A22–27, 35–37, ¶¶ 36–68, 102, 108–09. Further, the complaint alleges numerous facts establishing improper motive, including historical background, A21–22, ¶¶ 31–35, and a pattern of invidious actions against others, A28–35, ¶¶ 69–101. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977) (recognizing these forms of evidence in ascertaining improper motive). Because state of mind can be alleged generally, *see* Fed. R. Civ. P. 9(b), those allegations more than suffice to satisfy this element of the claim. *See Armstrong v. Daily*, 786 F.3d 529, 547 (7th Cir. 2015).

### 5. Appellees Lacked Probable Cause To Investigate Ms. Archer

In the specific context of retaliatory criminal investigations, the courts of appeals are split as to whether the plaintiff also must allege the absence of probable cause. *Compare Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1234–35 (9th Cir. 2006) (no), *with Glober v. Mabrey*, 384 F. App'x 763, 771–72 (10th Cir. 2010) (citing *McBeth v. Himes*, 598 F.3d 708 (10th Cir. 2010)) (yes). The Ninth Circuit has the better argument. The probable-cause requirement stems from *Hartman v. More*, which involved a retaliatory-prosecution cause of action, and thus "inducement to prosecute," given that the law-enforcement officer, not the prosecutor who is immune, is the defendant, but the prosecutor ultimately

32

makes the charging decision, 547 U.S. at 261–62. The probable-cause requirement is a necessary element of causation given the need to link the unlawful intent with the actual deprivation across several layers of governmental decision-making. *Id.* at 260. The requirement is ill-suited for a case like this where the Defendants harboring ill motive were also responsible for the deprivation of Ms. Archer's constitutional rights. *See Skoog*, 469 F.3d at 1233–34. This case does not involve "inducement" and the probable-cause requirement should not apply.

Moreover, because "the First Amendment does not itself require lack of probable cause in order to establish a retaliatory inducement" claim, that element, which goes to causation and damages, "has no bearing on whether a defendant has violated a clearly established . . . constitutional right" and need not be clearly established under a qualified immunity analysis. *Moore v. Hartman*, 644 F.3d 415, 423–25 (D.C. Cir. 2011) (alteration in original) (quotation marks omitted), *certiorari granted, judgment vacated*, 132 S. Ct. 2740 (2012), *judgment reinstated, Moore v. Hartman*, 704 F.3d 1003, 1004 (D.C. Cir. 2013). Thus, there was no need for Ms. Archer to plead absence of probable cause either to state a First Amendment claim or to pierce qualified immunity.

Even if the Court determines that the absence of probable cause is necessary to state a claim for retaliatory criminal investigation, Ms. Archer has

adequately pleaded it. Probable cause is absent where a "requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003). The existence of probable cause is a mixed question of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see also Stobinske-Sawyer v. Vill. of Alsip*, 188 F. Supp. 2d 915, 920 (N.D. Ill. 2002). Mixed questions of law and fact "will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). *See also McMillan v. Collection Prof'ls, Inc.*, 455 F.3d 754, 760 (7th Cir. 2006) ("[D]istrict courts must act with great restraint when asked to rule . . . on a motion to dismiss" adjudicating "issues of mixed fact and law"); *see also Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 941 n.3 (7th Cir. 2015); *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997).

Probable cause is no different, as courts normally cannot determine probable cause on a motion to dismiss (and, hence, on a motion for judgment on the pleadings). *See Craig v. Chicago Police Officers*, No. 05 C 0172, 2005 WL 1564982, at *6 (N.D. Ill. June 9, 2005) (denying motion to dismiss where the allegations that prosecution lacked probable cause were adequate); *see also Lamon v. Sandidge*, 232 F. App'x 592, 594 (7th Cir. 2007) (refusing to dismiss

action on pleadings because allegations of absence of probable cause would need to be accepted as true); *Gupta v. Owens*, No. 12 C 7855, 2014 WL 1031471, at *3 (N.D. Ill. Mar. 18, 2014) (denying motion to dismiss where complaint alleged lack of probable cause and attacks on complaint presented factual questions for discovery).

Ms. Archer pleaded in detail that Defendants targeted her without probable cause by asserting pretextual bases for their investigation into her and by submitting false information in their warrant affidavits. A43–48, ¶¶ 141–60. The district court's decision to disregard Ms. Archer's well-pleaded allegations in favor of extra-complaint materials without converting into a motion for summary judgment was fatally flawed. *Gen. Elec. Capital Corp.*, 128 F.3d at 1080.

The district court justified its consideration of the documents by citing the exception for concededly authentic documents "referred to in the plaintiff's complaint" that are "central to her claim." SPA12 n.10 (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). But "this is a narrow exception aimed at cases interpreting, for example, a contract." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). "What would not be cricket would be for the defendant to submit a document in support of his Rule 12(b)(6) motion that required discovery to authenticate or disambiguate . . . ."

35

*Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002). That occurred here, and the district court's reliance was improper as a matter of law in several respects.

**Falsity.** A document alleged to contain false information cannot, on its own, prove or disprove probable cause, *see Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976, 985 (N.D. Ill. 2009) (finding that police records were not "concededly authentic" where complaint alleged that they reflected false and "manufactured" information), and Ms. Archer alleged that Appellees manipulated and omitted information in several documents. A16, 35–36, 43–48, ¶¶ 3, 103–05, 141–60. *Cf. Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) ("Where a civil rights plaintiff attaches a police report to his complaint and alleges that it is false, . . . the contents of the report cannot be considered as true for purposes of ruling on a motion to dismiss.").

**Completeness.** The extra-complaint materials were cherry-picked by the Appellees from a trove of millions of documents obtained in the course of the John Doe proceeding. Many of the materials that Defendants selected purport to incorporate hundreds of thousands (or possibly millions) of pages that were not offered to the Court and that Ms. Archer has never had the opportunity to review. Even at trial, Ms. Archer would have the right to compel submission of the omitted materials. *See* Fed. R. Evid. 106. Ms. Archer's rights cannot be lesser on the pleadings than they would be at trial.

**Centrality.** With the exception of the warrant for the search of Ms. Archer's home, the extra-complaint documents are not central to Ms. Archer's complaint. *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (document must be "referred to in the plaintiff's complaint" to be considered in motion to dismiss). Ms. Archer had never seen the other documents before this litigation, and the only reference to them in her amended complaint was that they were false. In the case of the affidavit in support of the warrant for Ms. Archer's phone or email, the affidavit was not even referenced in the complaint, was filed with the district court only after Ms. Archer amended her complaint, and was one of four affidavits explicitly incorporated by reference along with "Applications, Affidavits, and other papers" filed at any time in the John Doe proceeding. And these materials can hardly be central if, as Ms. Archer now alleges, the John Doe judge did not even review them in connection with the warrant executed on her.

**Improper Judicial Notice.** The district court's alternative finding that it could take judicial notice of the extra-complaint materials because they are "court records" is likewise incorrect. SPA12 n.10. Judicial notice is appropriate only for documents that are "part of the public record." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013); *see also United States v. Neal*, 611 F.3d 399, 402 (7th Cir. 2010) ("This is not a subject on which a judge may take

judicial notice. The facts are adjudicatory, not legislative, and *don't appear to be general public knowledge*.") (emphasis added). Here, the documents Appellees appended to their motions are not part of the public record because they were and remain under seal. *See Two Unnamed Petitioners v. Peterson*, 866 N.W.2d at 180–83. Moreover, the court below erred by taking notice of these materials for the truth of the matters asserted. *Gen. Elec. Capital Corp.*, 128 F.3d at 1082 n.6; *Design Basics LLC v. Campbellsport Bldg. Supply Inc.*, 99 F. Supp. 3d 899, 918 (E.D. Wis. 2015).

Even if the district court were entitled to take some or all of these extra-complaint materials into account, the district court should have accepted Ms. Archer's "point of view" as to all allegations that challenge the factual content, statements, and allegations in these documents. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). Applying this standard, Ms. Archer's amended complaint easily alleges a lack of probable cause for investigating Ms. Archer for the two alleged crimes for which the Appellees putatively investigated her, the 2009 RFP and the 2010 RFP.

**2009 RFP.** For the 2009 housekeeping RFP, Appellees purportedly investigated Ms. Archer for violating the Wisconsin law that prohibits state employees from exercising "a discretionary power in a manner inconsistent with the duties of" his or her office "and with intent to obtain a dishonest

38

advantage for the officer or employee or another." Wis. Stat. § 946.12(3). But Appellees had no reason to believe that Ms. Archer took any action "inconsistent with the duties" of her office, much less that she intended any "dishonest advantage." The materials on which Appellees base their defense only indicate that Ms. Archer sent emails to other County officials, and they also fabricate Ms. Archer's involvement by falsely stating that Ms. Archer was aware of the alleged involvement of non-County employees in publicly disclosing information about an RFP bidder through a "forwarded" email. A429, ¶ 30(b). At the very least, this raises factual disputes on which discovery is appropriate.

**2010 RFP.** As to the 2010 RFP, the Appellees actively hid from the John Doe judge the that fact that Ms. Archer actively opposed awarding the contract to the bidder supposedly favored by the Walker administration by omitting this information and the underlying documentation from the affidavit offered in support of the warrant for the search of her home. Ms. Archer's active opposition to the supposedly favored bidder defeats any claim to probable cause that Ms. Archer intended any dishonest advantage: she could not have intended to obtain a dishonest advantage for the supposedly favored bidder by actively attempting to thwart any advantage flowing to that bidder. Failure of probable cause as to *mens rea* defeats probable cause altogether. *See, e.g.*, *Juriss*

*v. McGowan*, 957 F.2d 345, 349–51 (7th Cir. 1992); *Rogers v. Stem*, 590 F. App'x 201, 206, 207–08 (4th Cir. 2014).

**Aiding and Abetting.** The district court also improperly determined that there was probable cause to suspect Ms. Archer of aiding and abetting crimes by others. This fails because "[a] person aids and abets in the commission of a crime when he or she: (1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime; and (2) consciously desires or intends that the conduct will yield such assistance." *State v. Simplot*, 509 N.W.2d 338, 345 (Wis. Ct. App. 1993). As to the 2009 RFP, Defendants have no reasonable basis to believe that Ms. Archer was aware of the acts that they claim were improper, and as to the 2010 RFP, Defendants knew (and hid from the John Doe judge) that she took efforts diametrically opposed to the supposedly improper actions and intended the very opposite of "assistance."

**Unrelated Crimes.** The district court also incorrectly found that there was probable cause to investigate Ms. Archer because the Appellees had probable cause to investigate the missing charitable funds. *See* SPA33. But Ms. Archer had nothing to do with the missing charitable funds, and Appellees do not so much as suggest otherwise. *See* A115–16, ¶ 108. Likewise, the district court's belief that Appellees received "information" "about preferential

treatment in the county bidding process" by individuals other than Ms. Archer is not license to investigate Ms. Archer without probable cause. SPA33; A45, ¶¶ 146–47.

### B.   Ms. Archer's Retaliatory Arrest Claim Was Also Dismissed Incorrectly

Count IV, for retaliatory arrest, turns on many of the same First Amendment retaliation factors that govern Count I. *See Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th. 2003). It was established by, at latest, 2003 that retaliatory arrest without probable cause violates the First Amendment, *id.* at 1006 (sending claim to jury), and this right is particularized under *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012). It should therefore proceed for the reasons stated above.

### C.   Ms. Archer's Conspiracy Claim Should Be Reinstated

The district court dismissed Ms. Archer's conspiracy claims because it dismissed all the substantive constitutional violations. SPA35. But as discussed above, Ms. Archer has adequately alleged multiple substantive constitutional violations. Therefore, her conspiracy claim is well-pleaded.

## II.   Ms. Archer Adequately Pleaded That Appellees Violated Her Clearly Established Fourth Amendment Rights

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures"; it prohibits warrants issued without probable cause; and it requires that warrants "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. In Count II of her amended complaint, Ms. Archer pleaded sufficiently that Defendants violated her Fourth Amendment rights in five ways: (1) by searching her home and seizing her person based on a warrant they knew was not issued by a neutral and detached magistrate; (2) by searching Ms. Archer's home and seizing her person based on a warrant they procured through deceit; (3) by searching her home and seizing her person based on a warrant that any reasonable law-enforcement officer would know was not particularized; and (4) by ordering execution of the warrant in an overbroad and unreasonable manner. A56, ¶¶ 199–205. Because motions to resolve a case on the pleadings do not "permit piecemeal dismissals of *parts* of claims," *BBL, Inc.*, 809 F.3d at 325, a finding in Ms. Archer's favor on any of these theories requires reversal of the district court's decision dismissing Count II.

## A. The John Doe Judge Was Not a Neutral and Detached Magistrate

Appellees violated Ms. Archer's rights by searching her home and seizing her person based on a warrant they knew was not issued by a neutral and detached magistrate, but instead was either rubber-stamped by the John Doe judge or never signed by him at all. *United States v. Leon*, 468 U.S. 897, 914

42

(1984). The district court's conclusion that "at worst, [Ms. Archer's] allegations . . . support the inference that [the John Doe judge's] review of the warrants was not thorough" is judicial wagon-circling at its worst. SPA23. The John Doe judge swore under penalty of perjury that (1) he was working on another assignment that day, (2) he did not work free of charge, and (3) he did not work on the John Doe investigation. The affidavits are lengthy and incorporate hundreds of thousands of pages by reference, so reviewing them would have taken days. For this reason alone, the district court's judgment as to Counts II and IV, alleging Fourth Amendment violations, should be reversed.

### B.    The Appellees Lacked Probable Cause To Search Ms. Archer's Home

Setting aside the fact that the John Doe judge never reviewed the home-search warrant, Appellees violated Ms. Archer's rights by searching her home and seizing her person based on a warrant that they procured through deceit. A45–48, ¶¶ 146–60. It has been "firmly established in the criminal context since the Supreme Court decided *Franks v. Delaware*, 438 U.S. 154 (1978)," that an official cannot rely on a warrant if his own misleading statements were the basis for procuring it. *Betker v. Gomez*, 692 F.3d 854, 864 (7th Cir. 2012) (denying qualified immunity); *see also Juriss*, 957 F.2d at 350–52 (same). It was

therefore improper to dismiss Ms. Archer's complaint on the ground that Appellees had probable cause to search her house.

## C.  The Warrant for the Search of Ms. Archer's Home Was Not Particularized

Appellees also violated Ms. Archer's Fourth Amendment rights by searching her home and seizing her person based on a warrant that any reasonable officer would know was not particularized. The Fourth Amendment requires that a warrant "particularly describ[e] the . . . things to be seized." In the case of crimes of "exceptional scope," *see United States v. Spilotro*, 800 F.2d 959, 965 (9th Cir. 1986) (Kennedy, J.), simply referring to the criminal statute on which the warrant putatively rests is insufficient to establish particularity, *see, e.g.*, *United States v. Leary*, 846 F.2d 592, 601 (10th Cir. 1988); *United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980); *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982); *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987); *In re Application of Lafayette Academy*, 610 F.2d 1, 3 (1st Cir. 1979). Because courts have excluded evidence on that basis, *see, e.g.*, *Spilotro*, 800 F.2d at 968, qualified immunity is not available, *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004). This Court recognized the principle, at latest, in *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 580 (7th Cir. 1999).

44

There is no question that the breadth of the Wisconsin Misconduct in Public Office statute is "exceptional." It criminalizes violations of public duties, Wis. Stat. § 946.12, derived from "an assortment of sources," such as statutes, rules, guidelines, handbooks, custom, usage, and "perhaps other sources." *State v. Jensen*, 681 N.W.2d 230, 238 (Wis. Ct. App. 2004) (quotation marks omitted). In fact, the statute is sufficiently broad that the Wisconsin Supreme Court split evenly as to whether it is unconstitutional as void for vagueness. *See State v. Chvala*, 693 N.W.2d 747, 748 (Wis. 2005). The other statutes cited are equally broad. *See* Wis. Stat. §§ 19.58, 19.59, 939.05, 939.30.

The warrant for the search of Ms. Archer's home is not limited by the two topics described (the 2009 and 2010 RFPs) because these descriptions appear subsequent to the language "*including* the following" and are thus illustrative, not exhaustive. A402 (emphasis added). In considering whether a warrant with a laundry list of exemplars is particularized, courts consider whether the search conducted pursuant to the warrant was "restricted to the items on the list." *In re Grand Jury Proceedings*, 716 F.2d 493, 498 (8th Cir. 1983); *United States v. Bridges*, 344 F.3d 1010, 1017–18 (9th Cir. 2003); *United States v. George*, 975 F.2d 72, 75–76, 78 (2d Cir. 1992); *United States v. Washington*, 797 F.2d 1461, 1473 (9th Cir. 1986); *VonderAhe v. Howland*, 508

F.2d 364, 369 (9th Cir. 1974).[7] In the case of the raid of Ms. Archer's home, the executing law enforcement officers did not limit their search to items related to the 2009 and 2010 RFPs, instead ransacking her home and seizing *all* Ms. Archer's emails going back to 2006, *when she was still working in Green Bay*. A44, ¶ 143; *see also United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984) ("warrants specifying seizure of business records evidencing a crime have been held overbroad when the particular records were not readily identifiable and police in fact seized all records"); *compare United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980) ("It seems clear that the executing officers could not or made no attempt to distinguish bona fide records from fraudulent ones so they seized all of them in order that a detailed examination could be made later. This is exactly the kind of investigatory dragnet that the fourth amendment was designed to prevent.").

In fact, the Appellees cannot agree to this day about what topics were subject to search: the Investigator-Appellees claim that the 2009 RFP was not part of the search, A140, ¶ 156, while the Prosecutor-Appellees argue that the 2009 RFP was part of the search, Record, Dkt. No. 21 at 18–19. There is no

---

[7] Warrants drafted as the one here are fundamentally different from the warrant in *Andresen v. Maryland*, 427 U.S. 463, 480 (1976), which was limited in scope to the particularized named crimes despite a catch-all phrase. *United States v. Brown*, 832 F.2d 991, 996 (7th Cir. 1987).

way that a warrant is valid or particularized where the law-enforcement officers involved in its procurement and execution cannot agree on its subject or scope.

The district court tacitly conceded that the warrant did not limit the search by focusing on the affidavit that Appellees claim they offered in support of the warrant. *See* SPA19. But the warrant affidavit could not limit the search in this case. The affidavit was not incorporated by reference into the warrant, and an affidavit that is part of a warrant application does not limit the scope of the warrant unless the warrant explicitly "incorporated the affidavit by reference."[8] *United States v. Stefonek*, 179 F.3d 1030, 1033 (7th Cir. 1999); *see also Groh*, 540 U.S. at 557–58 ("The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents.") (denying qualified immunity). Even if an attached affidavit could suffice in some cases, *see United States v. Jones*, 54 F.3d 1285, 1291 (7th Cir. 1995) (suggesting that an affidavit may be "attached to the warrant or incorporated into it"), *but see Groh*, 540 U.S. at 558 (suggesting that an affidavit must use "appropriate words of incorporation, *and* . . . accompan[y] the warrant") (emphasis added), *see also United States v. Pratt*, 438 F.3d 1264, 1269 n.8 (11th Cir. 2006) ("Search

---

[8] The district court believed that the affidavit was incorporated into the warrant, but the warrant represented only that the affidavits was "attached," which does not amount to "appropriate words of incorporation." *Groh*, 540 U.S. at 558.

warrants can incorporate by reference the words of supporting documents if the documents are attached to the warrant."), the statement on the warrant that the affidavit was attached is false. The affidavit was not attached. Instead, Appellees hid the affidavit from Ms. Archer due to the ostensibly secret nature of the investigation, and carried out their search free from any purported limitation that the affidavit might have provided.

### D.     The Scope of the Search of Ms. Archer's Home Was Unlimited

The scope of the search was unreasonable. The investigative team, led by Mr. Weiss, A37–39, ¶¶ 112, 120, (1) intentionally searched areas where they knew they would not find responsive evidence, A39–40, ¶¶ 120, 125, and (2) obtained documents from well outside the time period of alleged wronging, A44, ¶ 143. Even if the Court finds that there were sufficient limitations on the face of the warrant, Appellees' "flagrant disregard" for such limitations rendered it a general warrant. *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992); *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978); *United States v. Medlin*, 798 F.2d 407, 411 (10th Cir. 1986); *see also United States v. Matias*, 836 F.2d 744, 747–48 (2d Cir. 1988) (collecting cases). In addition, the investigative team retained possession of non-responsive documents, did not return them, and, instead, caused them to be released them to the public. A44, ¶ 143. Law-enforcement officials are not permitted to retain indefinitely

48

materials that are not responsive to a warrant. *See Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976); *United States v. Tamura*, 694 F.2d 591, 595–97 (9th Cir. 1982); *United States v. Metter*, 860 F. Supp. 2d 205, 215–16 (E.D.N.Y. 2012); *United States v. Debbi*, 244 F. Supp. 2d 235, 237–38 (S.D.N.Y. 2003).

### E.     The District Court's Decision Dismissing the False Arrest Claim Should Be Reversed

Fourth Amendment protections apply when a person is "seized," which occurs when a state actor uses physical force or a show of authority and a private citizen submits to the show of authority. *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006). While *Michigan v. Summers*, 452 U.S. 692, 703 (1981), validates only a detention during a search "authorized by a *valid* warrant" (emphasis added), it is "clearly established that temporarily seizing a person while a search is conducted is justified only when the search itself is constitutional." *Poolaw v. Marcantel*, 565 F.3d 721, 735 n.14 (10th Cir. 2009). The *Summers* exception does not apply where the warrant is invalid, which is the case here. *See Summers*, 452 U.S. at 703 & n.18; *Poolaw*, 565 F.3d at 735 n.14; *Florida v. Royer*, 460 U.S. 491, 499 (1983); *see also Malley*, 475 U.S. at 344–46; *Harman v. Pollock*, 446 F.3d 1069, 1086 (10th Cir. 2006).

## III.    Prosecutorial Immunity Does Not Apply

A "prosecutor is not absolutely immune for acts that 'go beyond the strictly prosecutorial to include investigation.'" *Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016) (quoting *Fields v. Wharrie*, 740 F.3d 1107, 1111 (7th Cir. 2014)). The district court ignored this rule, dismissing Ms. Archer's First and Fourth Amendment claims against the Prosecutor-Appellees on prosecutorial-immunity grounds for three reasons. First, it held that "any actions associated with John Doe I" were prosecutorial rather than investigative. SPA28. Second, it held that any actions related to obtaining the warrant to search Ms. Archer's home were prosecutorial rather than investigative. Third, the district court absolved the Prosecutor-Appellees of any remaining investigative acts, including the search of Ms. Archer's home, because they were not physically present. Each of these holdings was erroneous.

### A.    The Prosecutors' Acts in John Doe I Were Investigative

To determine whether prosecutorial immunity applies, courts use a "functional approach," which considers what activities a prosecutor is performing, not her title. *Buckley*, 509 U.S. at 269. As this Court has explained, a "prosecutor only enjoys absolute immunity insofar as he is 'act[ing] within the scope of his prosecutorial duties.'" *Bianchi*, 818 F.3d at 318 (alteration in

50

original) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976)). And a prosecutor only performs his professional duties, such as "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury[,] *after a decision to seek indictment has been made.*" *Buckley*, 509 U.S. at 273 (emphasis added).

Applying this functional test, *Buckley* held that defendant prosecutors were not entitled absolute immunity because, at the time they carried out the investigation at issue, they lacked "probable cause to arrest petitioner or to initiate judicial proceedings" and so were not carrying out "the prosecutor's function as an advocate." *Id.* at 273–74 (quotation marks omitted). Instead, "[t]heir mission at that time was entirely investigative in character," and "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274; *see also Bianchi*, 818 F.3d at 318; *Hartman*, 547 U.S. at 262 n.8; *Fields*, 740 F.3d at 1113–14.

Ms. Archer's complaint alleges that the Appellees were engaged in investigative activities, and thus never assumed the prosecutorial function. Appellees never determined that probable cause existed to commence prosecution against Ms. Archer.[9] A28–33, ¶¶ 69–94. Indeed, Appellees chose

---

[9] The district court erroneously suggested that probable cause to search or investigate is sufficient to trigger absolute immunity. SPA10. In fact, only probable cause "to have [some]one arrested" is sufficient, *Buckley* at 274, given

the John Doe proceeding as their primary vehicle of harassment *because they did not need probable cause to open or expand it*. They only needed "reason to believe that a crime has been committed" within the jurisdiction. Wis. Stat. § 968.26(2)(am).

The Appellees never decided to indict Ms. Archer, A16, 48, 51–52, ¶¶ 3, 158, 159, 176, nor could they have: the John Doe proceeding culminates, at most, in a "complaint" that "has no more standing than a complaint issued by a magistrate on the verified oath of any informant, and . . . is subsequently subject to be tested on the question of probable cause at a preliminary examination prior to the filing of an information." *State v. Doe*, 254 N.W.2d 210, 212 (Wis. 1977). The Prosecutor-Appellees could thus only perform an investigatory function when participating in the John Doe.

The district court skirted these problems by redefining the entire John Doe procedure as a "judicial proceeding" in which prosecutors have absolute immunity for "any conduct." SPA28. This holding ignores not only the functional approach of *Buckley* and its progeny but also Wisconsin law interpreting the state's John Doe statute. *See Heidelberg v. Ill. Prisoner Review Bd.*, 163 F.3d 1025, 1027 (7th Cir. 1998) (a federal court is "bound to follow a

---

that the "issuance of an arrest warrant is an act of legal process that signals the beginning of a prosecution." *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 899 (7th Cir. 2001). The prosecutors never sought to have Ms. Archer arrested for the purpose of bringing charges.

state's highest court's interpretation of its own state law"). Under Wisconsin law, "a John Doe proceeding is intended as *an investigatory tool* used to ascertain whether a crime has been committed and if so, by whom."[10] *State ex rel. Reimann*, 571 N.W.2d at 390 (emphasis added); *see also In re Doe*, 766 N.W.2d 542, 546 (Wis. 2009) ("John Doe proceedings . . . . *are an investigative tool*.") (emphasis added); *State v. Libecki*, 830 N.W.2d 271, 272 n.1 (Wis. Ct. App. 2013) ("A John Doe proceeding is *an investigatory procedure* . . . .") (emphasis added).

Even if the John Doe proceeding were akin to a grand jury (which leads to an actual indictment, not the complaint to be tested at a preliminary hearing that results from a John Doe proceeding), *Buckley* denied prosecutorial immunity to prosecutors for their actions taken before a grand jury because "its immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect whom there was already probable cause to arrest." 509 U.S. at 275; *see also KRL v. Moore*, 384 F.3d 1105, 1113–14 (9th Cir. 2004); *Hill v. City of New York*, 45 F.3d 653, 662–63 (2d

_____

[10] Elsewhere in the decision, the court below repeatedly and correctly described the John Doe proceeding as an "investigation." *E.g.*, SPA1 ("The investigations in question were John Doe investigations."); SPA2 ("[A] John Doe's principal advantage is as an investigative tool."); *id.* at 5 ("GAB voted to join the investigation."); SPA9 ("[T]he Wisconsin supreme court shut the investigation down.").

Cir. 1995) (fact-specific nature of inquiry precluded dismissal on pleadings). *Buckley* thus squarely refutes the district court's holding that all actions taken in connection with a John Doe proceeding are immune, regardless of whether they are investigative or prosecutorial.

### B.    The Prosecutors Are Not Immune for Their Role in Obtaining Warrants

The district court held in the alternative that the Prosecutor-Appellees have absolute immunity "to the extent that the plaintiff's allegations involve prosecutors' representations to the John Doe judge to obtain search warrants." SPA13. This holding rests on a misreading of the amended complaint, which results in a misapplication of the law. Ms. Archer did not allege that the Prosecutor-Appellees made any representations to the John Doe judge to obtain search warrants for her office or house. To the contrary, she alleged that the Investigator-Appellees were the ones who prepared and submitted the affidavits for the warrants, and the Prosecutor-Appellees sanctioned and advised the process. A35, 38, ¶¶ 103–04, 113–15.

That distinction is crucial because, under *Burns v. Reed*, 500 U.S. 478 (1991), absolute immunity does not apply "to the prosecutorial function of giving legal advice to the police." *Id.* at 496. A prosecutor only receives "absolute immunity for [his] actions in a probable-cause hearing," not actions

taken outside of the hearing. *Id.* at 490, 496. Because giving legal advice to the investigators is precisely what Ms. Archer alleges the Prosecutor-Appellees did, the Prosecutor-Appellees are not entitled to absolute immunity under *Burns*.

## C.    Prosecutors Can Be Liable Under Section 1983 for the Actions of Their Subordinates

The district court also found that the Prosecutor-Appellees cannot be liable for "the execution of the warrant" because prosecutors "may be held liable only for personal conduct." SPA13–14. That is not the law. State actors can be held liable under Section 1983 if they "caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). This occurs where "the conduct causing the constitutional deprivation occurs at [the defendant's] direction or with [his] knowledge and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (second alteration in original) (quotation marks omitted). "That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quotation marks omitted); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986); *T.E. v. Grindle*, 599 F.3d 583, 588–89 (7th Cir. 2010).

Here, Ms. Archer alleged that Mr. Chisholm not only knew of but spearheaded the conspiracy to target Walker and his associates, including Ms. Archer. A15–16, ¶ 2. Mr. Chisholm informed members of the District

Attorney's office that it was his "duty" to "stop Walker," A26, ¶¶ 57–60, and encouraged his subordinates to target Walker and his associates, A26, ¶ 61. Mr. Chisholm further promoted the other two Prosecutor-Appellees, Mr. Landgraf and Mr. Robles, for that purpose, A22, ¶ 37. The Prosecutor-Appellees also helped develop the pretextual legal theories to target Ms. Archer and helped orchestrate the raid. A38, ¶ 115. Under controlling law, a prosecutor can be held liable for all these actions. Otherwise, a high-ranking law-enforcement officer could direct a subordinate to engage in blatantly unconstitutional conduct, such as physically attacking a political opponent under color of law, but escape liability because her hand was not on the baton.

## IV.    The Anti-Injunction Act Bars the District Court's Injunction of the *Three Unnamed Petitioners* Decision

The district court's order authorizing the Appellees to file copies of documents and electronic data seized in the John Doe II investigation with the clerk of the district court enjoins the Wisconsin Supreme Court's mandate that Appellees turn over "all originals and *all copies* of documents and electronic data" obtained during the investigation "within 30 days following the completion of proceedings in the U.S. Supreme Court on any petition for certiorari review." *Three Unnamed Petitioners*, 875 N.W.2d at 58, 60 (emphasis added). This injunction was unnecessary—the Wisconsin Supreme Court has

56

yet to deny a particularized request for use of the documents in this litigation—and violates the Anti-Injunction Act.

The Anti-Injunction Act embodies the principle that "lower federal courts possess no power whatever to sit in direct review of state court decisions." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 296 (1970). It provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. As the Supreme Court has observed, those exceptions are "narrow," and "any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011) (quotation marks and alterations omitted).

The district court's finding that its order does not implicate the Anti-Injunction Act because it authorizes the Appellees to violate the Wisconsin Supreme Court's mandate, rather than enjoining the mandate itself, is contrary to nearly a century of Supreme Court precedent. *See* SPA41 ("My resolution does not impair state court proceedings in any way. To the contrary, it leaves the state court order intact."). The Anti-Injunction Act applies not only to ongoing state proceedings, but also to "all steps taken or which may be taken

in the state court or by its officers from the institution to the close of the final process." *Hill v. Martin*, 296 U.S. 393, 403 (1935). "[I]t governs a privy to the state court proceeding…as well as the parties of record." *Id.* As such, a federal court cannot evade the Anti-Injunction Act "by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding." *Atl. Coast Line*, 398 U.S. at 287; *Okla. Packing Co. v. Okla. Gas & Elec. Co.*, 309 U.S. 4, 9 (1940) ("That the injunction was a restraint of the parties and was not formally directed against the state court itself is immaterial.").

Likewise, the district court's finding that the injunction was necessary to prevent "the state court [from] divest[ing] the defendants of evidence that may well be relevant to this litigation" is meritless for three reasons. SPA41. First, the injunction was unnecessary because the documents do not need to be submitted to the Wisconsin Supreme Court until the completion of proceedings in the United States Supreme Court on any petition for certiorari review, which will not occur until this fall at the earliest. At that point, if the district court still believes an injunction is necessary, the district court will have thirty days to issue it before Appellees must relinquish the documents. Until then, Appellees retain possession of the documents, making any injunction of the Wisconsin Supreme Court's mandate premature.

58

Second, there is no evidence that the Wisconsin Supreme Court will permanently divest the district court of evidence. To the contrary, the Wisconsin Supreme Court has stated that the documents "will not be destroyed, but will be stored by the clerk of this court in a sealed and secure manner." *Three Unnamed Petitioners*, 875 N.W.2d at 61. The stored documents will then "be available for use in related civil proceedings," including this one, "if there is a request and a determination that such use is proper under the circumstances." *Id*. The district court's presumption that the Wisconsin Supreme Court would deny a proper request violates the bedrock principle that federal courts must presume that state courts will perform their duties properly. *See, e.g.*, *Allen v. McCurry*, 449 U.S. 90, 95–96 (1980).

Third, the injunction is unnecessary because Appellees will still need permission from the Wisconsin Supreme Court to access the documents, as even the district court admits. SPA40 n.18 ("[T]he plaintiff may well be correct that defendants will have to seek permission to use the materials from the state court."). Physical custody is not the touchstone for whether secret state court materials can be used in federal litigation. Instead, this Court has held that the "state supervisory court" in charge of a grand jury proceeding must have the opportunity to pass on discovery requests for grand jury materials before a federal court is permitted to order their production in discovery in civil

litigation. *See, e.g.*, *Lucas v. Turner*, 725 F.2d 1095, 1099 (7th Cir. 1984) ("[W]hen state grand jury proceedings are subject to disclosure, comity dictates that the federal courts defer action on any disclosure requests until the party seeking disclosure shows that the state supervisory court has considered his request and has ruled on the continuing need for secrecy.") (quotation marks omitted); *Socialist Workers Party v. Grubisic*, 619 F.2d 641, 644 (7th Cir. 1980) (same). Only after "the party seeking disclosure shows that the state supervisory court has considered his request and has ruled on the continuing need for secrecy" will a federal court consider ordering production, *Lucas*, 725 F.2d at 1009 (quotation marks omitted), and, even then, a showing of "particularized need" is required, *Hernly v. United States*, 832 F.2d 980, 985 (7th Cir. 1987).

Appellees have not attempted to make a request showing particularized need, nor has the Wisconsin Supreme Court adjudicated such a request.[11]

---

[11] While it is true that Appellees made motions to intervene in the Wisconsin Supreme Court proceedings in the hope that they could retain possession of the millions of documents they seized in the John Doe II proceeding, the Appellees in these motions made no attempt to show particularized need. *See* Record, Dkt. No. 53-5 (December 2, 2015 order denying the Investigator-Appellees' motion to intervene); Record, Dkt. No. 59-1 (January 12, 2016 order denying the Prosecutor-Appellees' motion to intervene). Rather, they simply sought to retain all of the documents, regardless of whether those documents had any relevance to this matter. In fact, so weak was the showing of need in these motions that the district court stated "[i]n my view, the materials at issue are unlikely to be relevant to the present case." SPA37 n.17.

Until those two events occur, Appellees have not made a showing that an injunction is necessary. Enjoining the Wisconsin Supreme Court before then only creates in needless friction between federal and state courts—the very outcome that the Anti-Injunction Act and the principles of comity aim to prevent.

## Conclusion

For the foregoing reasons, the decision below should be reversed.

August 2, 2016

Respectfully submitted,

/s/ David B. Rivkin Jr.

Krista K. Baisch
James B. Barton
HANSEN REYNOLDS
DICKINSON CRUEGER LLC
316 North Milwaukee St.,
  Suite 200
Milwaukee, WI 53202
Phone: (414) 326-4941
kbaisch@hrdclaw.com

David B. Rivkin, Jr.
Mark W. DeLaquil
Richard B. Raile
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
drivkin@bakerlaw.com

*Attorneys for Plaintiff-Appellant*
*Cynthia Archer*

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,831 words, excluding parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) and Circuit Rule 32(b) because it has been prepared in a 14-point proportionally spaced font.

Pursuant to Circuit Rule 30(d), the undersigned counsel for Appellant certifies that the Required Appendix of Appellant contains all of the materials required by Circuit Rule 30(a) and (b).

Dated: August 2, 2016                         /s/    David B. Rivkin, Jr.
                                              David B. Rivkin, Jr.

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served on August 2, 2016, upon the following counsel of record in this appeal by the U.S. Appeals Court's ECF system.

Joel D. Bertocchi
HINSHAW & CULBERTSON LLP
222 N. LaSalle St., Suite 300
Chicago, IL 60601-1081
(312) 704-3000

Samuel J. Leib
Douglas S. Knott
Brent A. Simerson
LEIB KNOT GAYNOR LLP
219 N. Milwaukee St., Suite 710
Milwaukee, WI 53202
(414) 276-2102

/s/    David B. Rivkin, Jr.
David B. Rivkin, Jr.

No. 16-2417

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

CYNTHIA ARCHER,

*Plaintiff-Appellant*,

v.

JOHN CHISHOLM, DAVID ROBLES, BRUCE LANDGRAF,
ROBERT STELTER, DAVID BUDDE, AND AARON WEISS,

*Defendant-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 2:15-cv-00922-LA
The Honorable Lynn Adelman

---

**Special Appendix**

---

KRISTA K. BAISCH
JAMES B. BARTON
HANSEN REYNOLDS
DICKINSON CRUEGER LLC
316 North Milwaukee St.,
  Suite 200
Milwaukee, WI 53202
Phone: (414) 326-4941
kbaisch@hrdclaw.com

DAVID B. RIVKIN, JR.
MARK W. DELAQUIL
RICHARD B. RAILE
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
drivkin@bakerlaw.com

*Attorneys for Plaintiff-Appellant*
*Cynthia Archer*

## Special Appendix
## Table of Contents

1. Decision and Order (Dkt. No. 82) ..................................................... SPA1

2. Judgment (Dkt. No. 83)................................................................. SPA44

**Certificate of Compliance with Circuit Rule 30**

Pursuant to Circuit Rule 30(d), the undersigned counsel for Appellant certifies that the Special Appendix contains all of the materials required by Circuit Rule 30(a), and the Appendix contains all of the materials required by Circuit Rule 30(b).

Dated: August 2, 2016                              /s/  David B. Rivkin, Jr.
                                                   David B. Rivkin, Jr.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
_____

CYNTHIA ARCHER,

                **Plaintiff,**

v.                                     **Case No. 15-cv-0922**

JOHN CHISHOLM, et al.,

                **Defendants.**
_____

## DECISION AND ORDER

The plaintiff Cynthia Archer, who was an aide to Scott Walker when he was Milwaukee County executive and, briefly, second in command at the Department of Administration when Walker was elected governor of Wisconsin, brings this § 1983 action against Milwaukee County District Attorney John Chisholm and several of his assistants and investigators. Before me now are several motions brought by the defendants including motions to dismiss based on immunity and a motion regarding the custody of records potentially relevant to the case. The case arises out of two highly publicized criminal investigations. To fully understand the issues presented, it is helpful to have some understanding of the case's context. Thus, before analyzing the pending motions, I will briefly summarize the background of the case.

### I. Background

The investigations in question were John Doe investigations (hereinafter "John Doe I" and "John Doe II"). A John Doe investigation is a secret investigation conducted by a prosecutor somewhat like a grand jury investigation. Wisconsin courts have conducted John Doe-type investigations since before Wisconsin became a state. *State v. Washington*, 83 Wis. 2d 808, 819 (1978) (noting that John Doe proceedings were first

developed in 1839). A John Doe investigation must be authorized by a judge, and it is supervised by a judge. *See* Wis. Stat. §§ 968.02–04. Like a grand jury investigation, a John Doe's principal advantage as an investigative tool is that it enables prosecutors to compel testimony from citizens who might decline to provide it voluntarily. *Washington*, 83 Wis. 2d at 822–23.

John Doe I began in 2010, when Walker was Milwaukee County executive. Chisholm and his assistants conducted the investigation. The investigation began with an inquiry into the misappropriation of funds from a veterans' charity and subsequently uncovered evidence of an unlawful campaign fundraising operation being run out of Walker's office. Chisholm's office convicted six people of crimes, including three of Walker's staff members all charged with doing campaign work on government time.

Tim Russell, a former deputy chief of Walker's staff, pleaded guilty to stealing from the veterans' charity and was sentenced to two years in prison and 5 years of extended supervision. *See State v. Russell*, No. 12-CF-053 (Milwaukee Cty., Wis. filed Jan. 5, 2012). Kelly Rindfleisch, another Walker aide, was sentenced to six months in jail after pleading guilty to felony misconduct in office for doing fundraising work on county time. *See State v. Rindfleisch*, No. 12-CF-438 (Milwaukee Cty., Wis. filed Jan. 26, 2012). Darlene Wink, who was in charge of constituent services, pleaded guilty to two misdemeanor counts of political solicitation by a public employee for doing campaign work while being paid by county taxpayers. *See State v. Wink*, No. 12-CM-579 (Milwaukee Cty., Wis. filed Jan. 26, 2012). Other individuals were also convicted. Kevin Kavanaugh, the treasurer of the veterans' charity, was found guilty of felony theft and sentenced to 2 years in prison and 2 years of extended supervision.

*See State v. Kavanaugh*, No. 12-CF-052 (Milwaukee Cty., Wis. filed Jan. 5, 2012). William Gardner, owner of the Wisconsin & Southern Railroad Co., pleaded guilty to making excessive political contributions and intentionally unlawful political contributions after the investigation discovered that he was contributing to Walker's gubernatorial campaign through other people. *See State v. Gardner.* No. 11-CF-137 (Washington Cty., Wis. filed Apr. 11, 2011). Finally, Brian Pierick, Russell's boyfriend, was found guilty of intentionally contributing to the delinquency of a child. *See State v. Pierick*, No. 12-CF-022 (Waukesha Cty., Wis. filed Jan. 5, 2012).

John Doe I also involved an investigation into the bidding process for county projects. After being notified of impropriety in the process, the defendants investigated whether county officials were giving companies associated with John Hiller, the treasurer of Walker's gubernatorial campaign committee, special advantages. In the course of the investigation, the defendants learned that the plaintiff had communicated with Hiller about bid proposals. *See* Answer Ex. 11 (ECF No. 19-11) (search warrant and affidavit for the plaintiff's office); Ex. 18 (ECF No. 19-18) (search warrant and affidavit for the plaintiff's home). Pursuant to search warrants, the defendant investigators searched her office in the Milwaukee County courthouse and subsequently her home in Madison. After the search of her home, the plaintiff cooperated with the investigation, received immunity, and was not charged with any offense. *See* Am. Compl. ¶ 165 (ECF No. 17).

In November 2010, Walker was elected governor, and in 2011, the legislature enacted his controversial proposal regarding public employee unions known as Act 10. This legislation sparked a number of recall elections in which Democrats attempted to

unseat Walker and several state senators. John Doe I unearthed evidence indicating unlawful coordination between Walker's campaign committee and supposedly independent groups such as the Wisconsin Club for Growth ("WiCFG") and Wisconsin Manufacturers and Commerce ("WMC") during the 2012 recall election campaign. Long-standing Wisconsin law provided that if a candidate's committee coordinated campaign activities with a supposedly independent group, spending by the independent group had to be treated as a campaign contribution subject to reporting laws. *Wis. Coal. for Voter Participation, Inc. v. State Elections Bd.*, 231 Wis. 2d 670, 681 (Ct. App. 1999). Federal law is to the same effect. *O'Keefe v. Chisholm*, 769 F.3d 936, 941 (7th Cir. 2014). In the context of Walker's campaign, this meant that the applicable contribution limit would have been greatly exceeded.

In the fall of 2012, the evidence of unlawful coordination led a judge to authorize John Doe II.[1] John Doe II commenced in Milwaukee County, and its purpose was to explore the matter of the unlawful coordination. It soon became clear that individuals residing outside Milwaukee County were potential subjects of the investigation. Thus, in January 2013, because of the scope of the investigation, Chisholm, a Democrat, asked J.B. Van Hollen, the Republican attorney general of Wisconsin, to take over the investigation. Citing possible conflicts, Van Hollen declined. Compl. Ex. B, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014) (letter from J.B. Van Hollen declining

---

[1] The plaintiff was not a subject of John Doe II. Her amended complaint, however, contains many allegations concerning it. According to the plaintiff, this is so because John Doe II supports her allegation that John Doe I was retaliatory.

involvement in the John Doe II investigation).[2] Van Hollen did, however, recommend that the Government Accountability Board ("GAB"), a six-member board consisting of retired non-partisan judges which was responsible for regulating Wisconsin elections, get involved. *Id.* In June 2013, after reviewing the evidence, the GAB voted to join the investigation. The Board's chair, a former Republican legislator, noted that the Board had been presented with "credible, hard evidence that the law had been violated." Letter from Hon. Gerald C. Nichol, Chair, Government Accountability Board, to Hon. Robin Vos, Wisconsin state representative (Jan. 22, 2015).[3] Because the individuals being investigated in John Doe II lived in at least five counties, five district attorneys became involved, including Republicans and Democrats. At the request of these district attorneys, the supervising judge appointed a special prosecutor, Francis Schmitz, to run the investigation. Schmitz was a long time federal prosecutor and a Republican who in one filing disclosed that he had voted for Walker in the recall election. *See* Def. Schmitz's Suppl. Opp'n to Pls.' Mot. for Prelim. Inj. at 15, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Apr. 15, 2014).

Documents inadvertently unsealed by the court provide an indication of the kind of evidence that had been uncovered regarding unlawful coordination. The evidence had led Schmitz to conclude that Walker and several Republican operatives were involved in an expansive "criminal scheme" to evade campaign finance disclosure laws

[2] Unredacted version available at http://www.jsonline.com/news/statepolitics/documents-hundreds-of-pages-in-john-doe-probe-released-263847071.html.

[3] Available at gab.wi.gov/sites/default/files/news/70/ltr_nichol_to_vos_01_22_2015_final_signed_pdf_11835.pdf.

by coordinating with WiCFG and other organizations. Compl. Ex. C at 12–18, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014) (state's consolidated response to motions to quash a subpoena in John Doe II).[4] The evidence included:

> – emails from Walker's staff advising him to "[s]tress that donations to WiCFG are not disclosed" and to tell donors "that you can accept corporate donations and it is not reported;"
>
> – a $1 million deposit into WiCFG from Stephen Cohen, founder of SAC Capital Advisers, shortly after Walker was scheduled to meet with an SAC representative;
>
> – a March 2012 email from Walker to his fundraiser stating that "Bruce and Susie Kovner said that they want to give more" and 10 days later a $50,000 check from Bruce Kovner arrived in WiCFG's account. The check's memo line read "501c4-Walker;" and
>
> – a 2012 email from Walker's fundraiser to Walker regarding "meetings to make happen while in Sea Island . . . Paul Singer: Grab him." A few months later, $250,000 was deposited into WiCFG's account from Singer.

Def. Schmitz's Suppl. Opp'n to Pls.' Mot. for Prelim. Inj. at 4–6, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Apr. 15, 2014).[5]

The evidence uncovered also indicated that some of the secret contributors to WiCFG appear to have subsequently benefited from state action. Pet. for a Writ of Cert.

---

[4] Unredacted version available at http://www.jsonline.com/news/statepolitics/documents-hundreds-of-pages-in-john-doe-probe-released-263847071.html.

[5] Unredacted version available at http://www.jsonline.com/news/statepolitics/documents-governor-scott-walker-encouraged-donations-to-wisconsin-club-for-growth-john-doe-272369371.html.

at 8, *Chisholm v. Two Unnamed Petitioners*, 15-1416 (U.S. Supreme Ct. May 23, 2016). For example, John Menard, who runs a chain of big box stores in Wisconsin, contributed $1.5 million to WiCFG. *Id.* at 9. Subsequently Menard's company was awarded up to $1.8 million in tax credits from a state economic development corporation chaired by Walker. *Id.* Another contributor to WiCFG was a mining company, Gogebic Taconite LLC, which wanted to open a large open-pit iron mine and secretly gave $700,000 to WiCFG. *Id.* at 8–9. Soon after the 2012 recall and general elections, the legislature passed the bill easing environmental regulations that Gogebic sought, *id.*, and Walker signed it.

Regarding unlawful coordination, the special prosecutor also uncovered evidence indicating that the same individual, R.J. Johnson, was running both Walker's campaign committee and a supposedly independent outside group. Compl. Ex. C at 7–9, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014).[6]

The opponents of the John Doe investigations launched a full blown campaign against the investigations and against the defendants. Led by WiCFG director, Eric O'Keefe, the John Doe opponents brought four separate lawsuits, including the present action, challenging the defendants' conduct. Represented by David Rivkin of the Washington D.C. office of Baker and Hostetler, who also represents the plaintiff in the present case, O'Keefe sued the prosecutors, Schmitz and Chisholm, in federal court[7]

---

[6] Unredacted version available at http://www.jsonline.com/news/statepolitics/ documents-hundreds-of-pages-in-john-doe-probe-released-263847071.html.

[7] *O'Keefe v. Schmitz,* No. 14-0139 (E.D. Wis. filed Feb. 10, 2014).

and also brought an original action challenging John Doe II in the state supreme court.[8] In addition, O'Keefe sued the GAB in circuit court in Waukesha County.[9]

In their court filings, the opponents of John Doe II did not deny that Walker and WiCFG had coordinated. Rather, they asserted that the First Amendment barred applying anti-coordination laws to groups like WiCFG that only presented "issue ads," ads that stopped short of expressly telling viewers how to vote. *See, e.g.*, Compl. ¶ 197, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014). This legal position directly contradicted Wisconsin case law which held that expenditures for issue advocacy "that are 'coordinated' with, or made 'in cooperation with or with the consent of a candidate . . . or an authorized committee' [are treated] as campaign contributions." *Wis. Coal. for Voter Participation, Inc.*, 231 Wis. 2d at 681 (quoting *Buckley v. Valeo*, 424 U.S. 1, 46–47 (1976)); Wis. El. Bd. Op. 00-02 (reaffirmed Mar. 26, 2008). *See also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 202–03 (2003) (rejecting the idea that federal campaign finance statutes are limited "such that coordinated expenditures for communications that avoid express advocacy cannot be counted as contributions").

In his suit in federal court, O'Keefe sought to enjoin John Doe II, alleging that the prosecutors initiated it to retaliate against Walker's opponents in violation of the First Amendment. The Seventh Circuit, however, rejected O'Keefe's claim, stating that neither the Supreme Court nor any court of appeals had ever held that the First

---

[8] *State ex rel. Two Unnamed Petitioners v. Peterson*, No. 2014AP296-OA (Wis. Supreme Ct. filed Feb. 7, 2014).

[9] *O'Keefe v. Wis. Gov't Accountability Bd.,* No. 14CV01139 (Waukesha Cty., Wis. filed May 30, 2014).

Amendment forbids regulation of coordination between campaign committees and issue advocacy groups, let alone an inquiry into that topic. *O'Keefe*, 769 F.3d at 942.

O'Keefe and the other John Doe II opponents fared better in the original action that they brought in the state supreme court. In a 4-2 decision that broke along ideological lines, the Wisconsin supreme court shut the investigation down. The court adopted the theory put forward by the opponents of the investigation, that the First Amendment barred the John Doe II prosecutors from applying Wisconsin's anti-coordination law to entities like WiCFG which only spent money on issue ads. *State ex rel. Two Unnamed Petitioners v. Peterson,* 363 Wis. 2d 1 (2015). The decision overturned years of precedent and practice in Wisconsin. Justices Abrahamson and Crooks separately dissented. The prosecutors filed a petition for a writ of certiorari in the United States Supreme Court, which is presently pending.

The plaintiff now brings this lawsuit against the defendants alleging violations of her civil rights, including First Amendment retaliation claims and numerous Fourth Amendment claims.

## II. Immunity

The prosecutor and investigator defendants filed motions to dismiss based on immunity from liability for damages. I turn now to these motions. Where, as here, immunity is raised as an affirmative defense in a motion to dismiss, I consider only the facts alleged in the complaint, which I accept as true. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). While I have cited other public documents in outlining the background of the case, in addressing the pending motions, I consider only the plaintiff's allegations.

State actors who are defendants in § 1983 cases may be entitled to absolute or qualified immunity. The purpose of the immunity doctrine is to shield public officials from retaliatory litigation and the threat of such litigation so that they are not inhibited or otherwise precluded from doing their jobs properly. *See Imbler v. Pachtman*, 424 U.S. 409, 422–23, 428 (1976) (noting that the purposes underlying absolute immunity "include concern [about] harassment by unfounded litigation" and "the possibility that [a public official] would shade his decisions instead of exercising the independence of judgment required"); *Davis v. Scherer*, 468 U.S. 183, 195 (1984) (stating that the purpose of qualified immunity is to allow officials to "act without fear of harassing litigation").

Prosecutors are entitled to absolute immunity "for conduct that is functionally prosecutorial." *Bianchi v. McQueen*, No. 14-1635, 2016 WL 1213270, at *4 (7th Cir. 2016). "This immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal process." *Id.* Prosecutors are also absolutely immune for administrative and investigatory conduct that "relate[s] to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

Judicial proceedings are not limited to trials but rather include "'any hearing before a tribunal which perform[s] a judicial function.'" *Burns v. Reed*, 500 U.S. 478, 489–90 (1991) (quoting W. Prosser, Law of Torts § 94, at 826–27 (1941)). Thus, prosecutors have absolute immunity for "initiating a prosecution and in presenting the State's case," *Imbler*, 424 U.S. at 431; appearing at a probable cause hearing for a

search warrant, *Burns*, 500 U.S. at 487; evaluating evidence assembled by police, *Buckley*, 509 U.S. at 273; preparing for trial or a grand jury appearance, *id.*; and applying for an arrest warrant, *Thomas v. City of Peoria*, 580 F.3d 633, 639 (7th Cir. 2009) (citing *Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997)). In determining whether a particular action is entitled to absolute immunity, I consider its function and whether such function is "intimately associated" with the judicial rather than investigation phase of criminal proceedings. *Buckley*, 509 U.S. at 269–70 (citations omitted).

If a state actor is not entitled to absolute immunity, she may still be entitled to qualified immunity. She is entitled to qualified immunity unless (1) the plaintiff plausibly pleads that she violated a constitutional right, and (2) the constitutional right was clearly established at the time of the alleged violation. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). In determining whether a plaintiff has plausibly pled a claim, I assume that all of the factual allegations in the complaint are true, and I draw all reasonable inferences in the plaintiff's favor. *Chasensky v. Walker*, 740 F.3d 1088, 1093 (7th Cir. 2014). Because qualified immunity is meant to spare public officials from the burdens of litigation, it "should be resolved at the earliest possible stage of litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). If a defendant asserts that she is entitled to qualified immunity, the plaintiff bears the burden of defeating the immunity claim. *Betker*, 692 F.3d at 860. I turn now to the immunity issue insofar as it relates to each of the plaintiff's claims.

## A. Fourth Amendment Search Claims

The plaintiff alleges that the searches of her office in the Milwaukee County courthouse and of her home violated the Fourth Amendment. The defendants obtained

search warrants for both of the searches. The plaintiff's response to the existence of the warrants is to challenge their validity. In order to prevail on her challenge, the plaintiff had to have a legitimate expectation of privacy in the space covered by the warrant. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). This depends on 1) whether the plaintiff exhibited an actual expectation of privacy, and 2) whether her expectation was reasonable. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007).

With respect to the search of her county office, both the plaintiff's allegations and the office warrant[10] establish that at the time the warrant was obtained and executed

---

[10] In evaluating the plaintiff's claim, I may consider the office and home warrants because the complaint refers to them and because they are central to her Fourth Amendment claims. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (stating that "a defendant may introduce certain pertinent documents if the plaintiff failed to do so" and that such documents "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim"). The plaintiff argues that I may not consider the warrants because they are not "concededly authentic." *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (stating in dicta that such documents must be "concededly authentic"). The purpose of the "concededly authentic" requirement is to prevent consideration on a motion to dismiss of a document that "require[s] discovery to authenticate or disambiguate." *Id.* at 739. Here, the plaintiff does not argue that the copies of the warrants submitted by the defendants are inauthentic. Further, they contain a file stamp from state court, evidence that the copies the defendants provided are the authentic court-issued warrants. Therefore, I will consider the warrants. *See ABN AMRO, Inc. v. Capital Int'l, Ltd.*, No. 04 C 3123, 2007 WL 845046, at *11 (N.D. Ill. Mar. 16, 2007) (considering documents central to plaintiff's claims where plaintiff argued that documents were unauthenticated but did not assert that they were inauthentic). Further, I may take judicial notice of the warrants, which are publicly available court records. *Sherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) (stating that a court may take judicial notice of court records); *see also Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (stating that a court my take judicial notice of a public record on a motion to dismiss).

I may also consider the affidavits supporting the warrants, which the warrants reference and which were file-stamped with the warrants. The plaintiff argues that the warrants did not incorporate the affidavits because when served the affidavits were not physically appended. *See United States v. Jones*, 54 F.3d 1285, 1290–91 (7th Cir. 1995). However, the plaintiff did not allege this in her complaint. Further, the language of the warrants explicitly incorporate the affidavits, and the affidavits were file-stamped

the plaintiff was no longer employed by Milwaukee County. The plaintiff alleges that in November 2010, she left county employment and joined Walker's gubernatorial transition team. Am. Compl. ¶ 23 (ECF No. 17). She further alleges that the defendants did not obtain the warrant until December. *Id.* ¶ 104. The affidavit supporting the warrant indicates that the plaintiff officially left county employment on December 10, and the warrant was issued on December 17. Answer Ex. 11 at 7 (ECF No. 19-11). Because the plaintiff was no longer employed by the county when the warrant was executed, she abandoned the county office and computer previously issued to her and no longer had a legitimate expectation of privacy in them. *See United States v. Procknow*, 784 F.3d 421, 426–27 (7th Cir. 2015) (concluding that a person who checks out of a hotel no longer has a privacy interest in his hotel room). Thus, the plaintiff fails to plausibly plead a Fourth Amendment claim relating to the search of her office.

## 1. Absolute immunity

With respect to the search of her home, I first note that most, if not all, of the plaintiff's allegations against the prosecutor defendants can be resolved quickly. As discussed, to the extent that the plaintiff's allegations involve the prosecutors' representations to the John Doe judge to obtain the search warrants, the prosecutors are entitled to absolute immunity, *Burns*, 500 U.S. at 487, even if they acted maliciously or misrepresented facts, *id.* at 485. The rest of the plaintiff's allegations concern the execution of the warrant, and she does not allege that the prosecutor defendants took part in this process. Under § 1983, the prosecutor defendants may be held liable only

on the same date as the warrants. Answer Ex. 11 (ECF No. 19-11) (office warrant and affidavit); Ex. 18 (ECF No. 19-18) (home warrant and affidavit).

for personal conduct. *Gossmeyer*, 128 F.3d at 495 (7th Cir. 1997). Thus, they have no liability for the search of the plaintiff's home.

### 2. Qualified immunity – validity of warrant

Turning to qualified immunity, again, to overcome qualified immunity the plaintiff must plausibly allege that the defendants violated a constitutional right, and that the right was clearly established at the time of the violation. The plaintiff does not meet this burden because she fails to plausibly allege that the defendants violated her Fourth Amendment rights in any respect.

The plaintiff first attacks the validity of the search warrant for her home. In order for a search warrant to be valid, it must (1) be issued by a neutral, disinterested magistrate; (2) establish probable cause that the evidence sought will aid in obtaining a conviction of a particular offense; and (3) particularly describe the things to be seized and the place to be searched. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Even where a warrant is invalid for one of these reasons, an officer ordinarily acts reasonably, and is therefore entitled to qualified immunity, if the warrant is judicially-authorized. *Malley v. Briggs*, 475 U.S. 335, 344–45 (1993); *United States v. Leon*, 468 U.S. 897, 920–21 (1984); *Junkert v. Massey*, 610 F.3d 364, 369 (7th Cir. 2010). An officer is not expected to question a judicial determination. *Leon*, 468 U.S. at 920–21. Only where it is objectively unreasonable for an officer to rely on a judicially-approved warrant will qualified immunity be withheld. These situations include: (1) where the judge was misled by false or reckless information, (2) where the magistrate wholly abandoned his judicial role, (3) where the warrant totally lacked the indicia of probable cause, and (4)

where the warrant was facially deficient as for example being insufficiently particularized. *Id.* at 923.

### a. Neutral magistrate

The plaintiff first contends that the John Doe I judge, Neal Nettesheim, a long time Wisconsin circuit and appellate court judge, was not a neutral magistrate but acted as a "'rubber stamp' for the Defendants' agenda and made no effort to scrutinize the legal or factual basis for the requested warrants and subpoenas." Am. Compl. ¶ 78. Of course, a John Doe judge "must conduct himself as a neutral and detached magistrate." *Washington*, 83 Wis. 2d at 824 (internal quotations and citation omitted). This "require[s] severance and disengagement from activities of law enforcement." *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). However, a judge is presumed to be neutral and detached. *See Aleman v. Honorable Judges of Circuit Court of Cook Cty.*, 138 F.3d 302, 307 (7th Cir. 1998). The plaintiff's "rubber stamp" allegations concerning Judge Nettesheim are conclusory and merely appropriate language from the *Leon* case. *See Leon*, 468 U.S. at 914. The plaintiff provides no allegations of fact in support of her assertion that Judge Nettesheim was biased or not neutral. *See Shadwick*, 407 U.S. at 350–51 (concluding that plaintiff failed to impeach a magistrate's neutrality because he made "no showing whatsoever . . . of partiality, or affiliation of [the magistrate] with prosecutors or police"). Thus, her claim that Judge Nettesheim was not a neutral magistrate fails. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that conclusory allegations in a complaint may be disregarded).

b. Probable cause

The plaintiff next alleges that the warrant was not based on probable cause. "Probable cause is a fluid concept [which] turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause exists for a search warrant where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. In examining whether there was probable cause for the warrant, I "give great deference to the conclusion of the judge who initially issued" it. *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011) (internal quotations and citations omitted).

The plaintiff's allegation of a lack of probable cause for the search of her home is contradicted by the warrant. The warrant was based on the defendant Stelter's affidavit, which Judge Nettesheim concluded established probable cause. The warrant indicates that the defendants had reason to believe that the plaintiff had violated Wis. Stat. § 946.12, Wis. Stat. § 11.36, and Milwaukee County Ordinance § 9.06, all of which in various ways prohibit public employees from using their position to inappropriately benefit themselves or others. Answer Ex. 18 at 2–3, 6, 16–18 (ECF No. 19-8) (home warrant and affidavit). The affidavit describes two separate incidents on which the defendants' belief was based.

The first, referred to as the Reuss Plaza lease, involved bidding on a county lease, then held by The Boerke Company. The defendants had been notified of impropriety in the bidding process and believed that county officials were working to favor a particular bidder. *See* Am. Compl. ¶¶ 146–47. The affidavit indicates that several county officials including the plaintiff had ties to John Hiller, the treasurer of Walker's

gubernatorial campaign committee who had an interest in The Boerke Company, which was bidding for renewal of the lease. *Id.* at 18–24. Large Walker donors also had an interest in The Boerke Company. The affidavit contains facts which support probable cause that county officials worked with Hiller to give the Boerke Company an unfair advantage in the bidding process in violation of state law. For example, the affidavit outlines several instances of suspicious timing between events related to the lease negotiations and donations to Walker's gubernatorial campaign, states that county officials failed to follow normal bidding procedures, and cites emails between county officials and Hiller discussing the Reuss Plaza bid. *Id.* Further, the affidavit also establishes probable cause to believe that the plaintiff was involved in this scheme. She sent a series of emails from her personal email account concerning the bidding process, including emails that proposed that Hiller take certain actions relating to the bidding process and that discussed the process with him. *Id.* at 22–24. She sent some of these emails to Hiller directly and some through other county officials. Based on the information in the affidavit, Judge Nettesheim reasonably concluded that county officials attempted to provide Walker associates and funders with an unfair advantage in the Reuss Plaza bidding process. The judge also reasonably concluded that the plaintiff was a party to this.

The second incident outlined in Stelter's affidavit involving the plaintiff concerned the bidding process for county housekeeping services. Defendants suspected Hiller of being a middleman between county officials and a bidder for the housekeeping contract, Mid American Building Services, and they believed that county officials had, at Hiller's request and to advantage Mid American, leaked information about the bidding process

that was supposed to be confidential. This belief too was supported by probable cause. The affidavit states that Hiller exchanged emails with county officials regarding Mid American, states that the county corporation counsel advised the county executive's office that the disclosure of certain information related to the bidding process was prohibited, cites emails in which such confidential information was sent to a conservative blogger who then published the information online, and details several payments from Mid American to Hiller during this time. *Id.* at 29–31. And again, the affidavit also establishes probable cause to believe that plaintiff was involved. It discusses emails sent by the plaintiff from her personal account regarding the bidding to Walker aide, Tim Russell, who forwarded it to a private individual who posted it on a blog owned by Russell. *Id.* at 30–31. Based on this information, Judge Nettesheim reasonably concluded that there was probable cause to believe that county officials had unlawfully disclosed procurement information related to the housekeeping bidding contract with the intent to advantage Mid American in violation of state law, and that the plaintiff was a party to the matter.

### c. Particularized warrant

The plaintiff also alleges that the warrant was invalid because it was not particularized. "The Fourth Amendment requires that a warrant particularly describe the place to be searched and the . . . things to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The specificity required depends on the circumstances of the case. *Id.* Generic descriptions of items to be seized are sufficient if "the warrant more specifically identifie[s] the alleged criminal activities in connection with which the items [are] sought." *Id.* at 964; *see also United States v. Henson*, 848 F.2d 1374,

1382–83 (6th Cir. 1988) (stating that "a description is valid if it is as specific as the circumstances and nature of the activity . . . permit"). As noted, in determining whether a warrant is sufficiently particularized, I may consider both the warrant and Stelter's affidavit because the warrant incorporated the affidavit by reference. *Spilotro*, 800 F.2d at 967.

Again, the warrant contradicts the plaintiff's allegations. The warrant describes the place to be searched, the plaintiff's residence, and specifies the items to be seized, namely "records and information relating to" the Reuss Plaza lease and the Mid American housekeeping contract. Answer Ex. 18. Contrary to the plaintiff's assertion, this case is not similar to *Spilotro* in that the warrant here was far more specific. Although it employed descriptive terms such as "records," "documents," and "information," it also referenced both of the statutes allegedly violated and the specific incidents allegedly constituting the violations. Thus, the warrant here differed from the warrant in *Spilotro*, which was "of exceptional scope." *Spilotro*, 800 F.2d at 964. Further, Stelter's affidavit described the Reuss Plaza and Mid American situations in detail, further limiting the scope and eliminating possible confusion about what items were authorized to be seized.

Because the plaintiff fails to sufficiently allege that Judge Nettesheim was not a neutral and detached magistrate or that the warrant was unsupported by probable cause or insufficiently particularized, I conclude that the warrant was valid. Thus, the plaintiff fails to plausibly plead a Fourth Amendment violation and, accordingly, defendants are entitled to qualified immunity.

### 3. Qualified immunity – justifiable reliance on judicial approval

However, even if the warrant were invalid, the defendants would still be entitled to qualified immunity if it was reasonable for them to rely on it. *Leon*, 468 U.S. at 920–21. As stated, reliance is objectively unreasonable only (1) where the judge was misled by false or reckless information, (2) where the judge wholly abandoned his judicial role, (3) where the warrant was so lacking in the indicia of probable cause, or (4) where the warrant was facially deficient, e.g. being insufficiently particularized. *Id.* at 923.

a. False, misleading, or reckless information

The plaintiff alleges that the defendants provided Judge Nettesheim with false or misleading information in the Stelter affidavit. "A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Betker,* 692 F.3d at 860 (internal quotations and citation omitted). Reckless disregard for the truth includes situations in which the officer had serious doubts about the truth of information, had obvious reason to doubt the information, or failed to disclose facts that he knew would negate probable cause. *Id.* at 860. "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant," and an attack must be more than conclusory. *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *Suarez v, Town of Ogden Dunes*, 581 F.3d 591, 596 (7th Cir. 2009).

The plaintiff alleges that the defendants omitted information from the affidavit that would have negated probable cause such as the fact that the County didn't accept any

of the Reuss Plaza bids, that the letter informing defendants of impropriety in the bidding process stated that it did not affect the County's consideration of bids, and that the plaintiff's undisclosed emails reveal that she opposed awarding the lease to Hiller's company. However, the documents presented to Judge Nettesheim contradict many of the plaintiff's allegations. For example, Stelter's affidavit stated that the bidding process had been canceled, and all emails to and from the plaintiff referenced in the affidavit were attached to it. Investigator Defs.' Br. in Supp. Ex. E at 21 (ECF No. 43-5); Prosecutor Defs.' Br. in Supp. Ex. C at 48, 58–59, 60–64 (ECF No. 21-4) (attachments to home warrant affidavit).

Even if the plaintiff's allegations regarding omissions by defendants were true, however, such omissions would not negate probable cause. As to the alleged omission that none of the Reuss Plaza bids were accepted and that the impropriety in the bidding process did not affect the outcome, Wis. Stat. § 946.12(2) does not require that a dishonest advantage actually be obtained, only that a public employee act "with intent to obtain a dishonest advantage." Thus, the fact that the alleged plan to favor one vendor did not come to fruition does not negate probable cause that Wisconsin law was violated.

The fact that the plaintiff opposed awarding the lease to the favored bidder also does not negate probable cause with respect to her. According to the warrant and affidavit, defendants' theory with respect to the plaintiff was that she aided and abetted others or was part of a broad conspiracy. Under Wisconsin law, a person aids and abets when she "(1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime; and (2) consciously

desires or intends that the conduct will yield such assistance." *State v. Simplot*, 180 Wis. 2d 383, 401–02 (Ct. App. 1993). "The same intent required for conviction as a direct perpetrator of a crime is not required for conviction as an aider and abettor." *State v. Williquette*, 125 Wis. 2d 86, 90 n.1 (Ct. App. 1985); *see also State. v. Stanton*, 106 Wis. 2d 172, 177 (Ct. App. 1982) ("[A] person may be a party to a crime, as aider and abettor or as conspirator, even though the crime committed was not the crime which the defendant intended."). Thus, probable cause with respect to the plaintiff as an aider and abettor does not require evidence that she intended the favored bidder to receive a dishonest advantage. Rather, it requires only a showing that her conduct helped others violate Wis. Stat. § 942.16 and that she intended her conduct to do so. The warrant and affidavit meet this standard insofar as they discuss various pieces of improper information that the plaintiff provided on request to other county officials and in turn to Hiller via her private email.

### b. Abandoned judicial role

With respect to the plaintiff's allegations that Judge Nettesheim was not neutral, even assuming that they are true, the plaintiff must allege more to defeat qualified immunity. Only where a judge has "wholly abandoned his judicial role" can an officer or prosecutor be said to have acted unreasonably in relying on a judicially-authorized warrant. *Leon*, 468 U.S. at 923. An example of such abandonment is the behavior of the judge in *Lo-Ji Sales, Inc. v. New York*, who "yielded to the State Police . . . the completion of the . . . warrant;" was present at and "conducted a generalized search;" "allowed himself to become a member, if not the leader, of the search party;" and instructed officers on what to seize. 442 U.S. 319, 327 (1979); *see also Leon,* 468 U.S.

at 923 (citing *Lo-Ji* as an example of "wholly abandon[ing the] judicial role"). Nothing in the plaintiff's complaint indicates that Judge Nettesheim's conduct was even remotely comparable. At worst, her allegations, including those made at oral argument, support the inference that Judge Nettesheim's review of the warrants was not thorough. A lack of thoroughness does not rise to the level of wholly abandoning the judicial role such that it was objectively unreasonable for executive branch employees to rely on his approval of the warrant.

### c. Lacking in indicia of probable cause or particularity

Further, I have already concluded that the warrant was supported by probable cause and that it was sufficiently particularized. The analysis that supports those conclusions also supports the conclusion that, even if probable cause was absent or the warrant was insufficiently particularized, it was not so deficient that reliance on it was objectively unreasonable. For these reasons, even if the warrant was invalid, all defendants are entitled to qualified immunity on the plaintiff's Fourth Amendment claims related to the warrant because they reasonably relied on the judicial approval of it.

### 4. Qualified immunity – scope of search

The plaintiff also alleges that defendants exceeded the scope of the warrant in violation of the Fourth Amendment because they searched unauthorized places and seized unauthorized documents. With respect to the places searched, "a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). The warrant authorized a search of the plaintiff's entire residence. Answer Ex.

18. Further, the warrant authorized the seizure of small items such as paper documents and electronic storage media like thumb drives and CD-ROMs, giving defendants the leeway to search small spaces within the home where these items may have been located. Thus, the plaintiff's allegation that the investigators should not have searched her bathroom, kitchen cabinets, dresser drawers, and closets is without merit.

As to the plaintiff's objection to the seizure of her computer, phone, and private emails, a search is not unreasonable in scope because of the inadvertent seizure of items not covered by the warrant. *Henson*, 848 F.2d at 1383; *see also Guest v. Leis*, 255 F.3d 325, 334–35 (6th Cir. 2001) (applying *Henson* in the context of § 1983 claims). "This is especially true when the extra-warrant items were not received into evidence against the defendant." *Henson*, 848 F.2d at 1383. Here, the warrant authorized an extensive seizure, and it would be unreasonable to require officers to "sift through the large mass of documents and computer files." *Id.* Further, the warrant here, in fact, authorized the seizure of the plaintiff's computer, phone, and private emails. Moreover, the seizure of the computer and phone, which contained her private emails, was reasonable under the circumstances. "Unlike a physical object that can be immediately identified as responsive to the warrant or not, computer files may be manipulated to hide their true contents." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010). Thus, it was reasonable for the defendants to seize the plaintiff's computer and phone, and all of the files contained on them, in order to conduct a forensic examination and take time to search for files authorized by the search.

With respect to the plaintiff's contention that the search was unreasonable because defendants failed to return items unauthorized by the warrant, she does not

allege this in her complaint.[11] Thus, even if failing to return the unauthorized items amounted to a Fourth Amendment violation, the plaintiff does not allege such a claim.[12] Further, she cannot use her brief in opposition to the defendants' motions to add the allegation. *See Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989).

Finally, the plaintiff alleges that the defendant investigators behaved unreasonably in other respects during the search. *See, e.g.*, Am. Compl. ¶ 116 (alleging that the defendants "thunderous[ly] hammer[ed] on her front door," yelled at her, and brought a battering ram with them), ¶ 118 (alleging that the defendants tipped off reporters about the search beforehand), ¶ 119 (alleging that officers entered with guns drawn), ¶ 123 (alleging that an officer advised her not to smoke in her home).[13] While the Fourth Amendment does protect against unreasonable behavior during a search and seizure, officer conduct must rise to the level of an unreasonable use or show of

---

[11] The plaintiff argues that she alleged that the defendants failed to return items to her in paragraph 143 of her amended complaint, but I disagree. Paragraph 143 alleges that "[t]he Milwaukee District Attorney's office took possession of . . . every email Archer wrote or received on her personal email account," that "these emails were released to the public," and that the defendants seized them "to embarrass, intimidate, harass, and retaliate against Archer." Nowhere in this paragraph does the plaintiff allege that the defendants failed to return the documents.

[12] Moreover, the plaintiff does not argue or point to any case law supporting the proposition that a failure to return unauthorized items, in and of itself, amounts to a Fourth Amendment violation.

[13] In her original complaint, the plaintiff alleged additional unreasonable conduct. *See, e.g.*, Original Compl. ¶ 90 (ECF No. 1-1) (alleging that officers "screamed at her and forbade her from leaving the residence, even for a brief period to smoke a cigarette"); *id.* ¶ 87 (alleging that officers "flooded in, throwing the warrant at her without giving her an opportunity to read it"), ¶ 91 (alleging that "[n]o one informed her that she had a constitutional right to remain silent and the right to an attorney"). However, the plaintiff removed these allegations from her amended complaint because they were directly refuted by materials the investigator defendants submitted with their original answer.

force to constitute a violation. *See Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). The question of reasonableness is an objective standard judged from the perspective of a reasonable officer on the scene. *Id.* Here, the allegations do not rise to the level of conduct that the Seventh Circuit has found to be so excessive as to be unreasonable. *See, e.g.*, *id.* (concluding that the use of a submachine gun to round up and detain residents during a search was objectively unreasonable); *Jacobs v. City of Chi.*, 215 F.3d 758, 773–74 (7th Cir. 2000) (concluding that pointing a gun at an elderly man's head for ten minutes after realizing he was not the desired suspect was objectively unreasonable); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (concluding that "officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation"); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992) (concluding that pointing a gun at a nine-year-old child during a search and threatening to pull the trigger was objectively unreasonable). The plaintiff does not allege that she was held at gunpoint or that the officers used or threatened to use force against her in any way. Thus, I conclude that the conduct alleged in the complaint was not objectively unreasonable and thus the plaintiff has not sufficiently pled a claim based on the defendants' conduct during the search. *See McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002) (concluding that "an excessive number of squad cars or drawn guns [does not] violate the fourth amendment by giving fright or offense, if the seizure is supported by probable cause and otherwise reasonable").

The plaintiff also alleges that the defendants leaked other information regarding the John Doe proceeding to the press. *See, e.g.*, Am. Compl. ¶¶ 90–91 (alleging that the defendants leaked information about the John Doe proceeding by filing "overbroad

criminal complaints" and disclosing irrelevant information during sentencing hearings), ¶ 110 (alleging the defendants leaked to the media that the plaintiff was a target of the John Doe investigation), ¶ 172 (alleging that the defendants leaked information to the press, including that they had "bombshell" evidence likely to lead to criminal complaints). Leaking information does not constitute a search, and the plaintiff does not allege that the defendants leaked information obtained during the search of her home or her detention,[14] and thus the leak allegations are not actionable under the Fourth Amendment. *See Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992); *United States v. Kaczynski*, 923 F. Supp. 161, 163 (D. Mont. 1996). Because the plaintiff has failed to adequately plead a Fourth Amendment violation related to the scope of the search, the defendants are entitled to qualified immunity on this claim as well.

**B. First Amendment Retaliation Claim**

The plaintiff also claims that the defendants violated the First Amendment by investigating her as part of John Doe I in retaliation for her work on and advocacy for Act 10. She alleges that many of the defendants' actions were retaliatory, including initiating John Doe I, applying for search warrants as part of John Doe I, misrepresenting information to the John Doe I judge, and making strategic decisions about the direction and scope of John Doe I.

---

[14] The plaintiff alleges that documents obtained during the search "were released to the public" but does not allege that the defendants released them. Am. Compl. ¶ 143. Further, it appears that it was the John Doe judge and not the defendants who made the documents publicly available when he ordered, based on a motion by the *Milwaukee Journal Sentinel*, that documents seized from Milwaukee County and its current and former officials, including the plaintiff, be returned and made subject to Wisconsin's public records law. *See* Order on Mots. for Limited Intervention and Access to Public Records, *In the Matter of a John Doe Proceeding*, No. 10JD000007 (Milwaukee Cty.,

### 1. Absolute immunity

As discussed, a John Doe proceeding is a judicial proceeding, *see Washington*, 83 Wis. 2d 808 (stating that John Doe proceedings are judicial and not executive in nature). And, as stated, prosecutors have absolute immunity for all conduct associated with the judicial phase of a criminal proceeding. Thus, the prosecutor defendants are entitled to absolute immunity for any actions associated with John Doe I. See *Harris v. Harvey*, 605 F.2d 330, 336 (7th Cir. 1979) (holding that prosecutors have immunity for conduct during a John Doe proceeding); *see also Buckley*, 509 U.S. at 273 (stating that absolute prosecutorial immunity applies to preparation and presentation at grand jury proceedings). This includes initiating John Doe I, *Imbler*, 424 U.S. at 431; applying for search warrants, *Burns*, 500 U.S. at 487; misrepresenting information to the judge, *id.* at 485, and making strategic decisions related to the John Doe proceedings, *Buckley*, 509 U.S. at 273.

### 2. Qualified immunity – constitutionally protected speech

In addition, both the prosecutor and investigator defendants are entitled to qualified immunity with respect to the plaintiff's First Amendment retaliation claim. To state such a claim, the plaintiff must allege that (1) her speech was constitutionally protected, (2) she suffered a deprivation likely to deter protected speech, and (3) retaliating against the protected speech was a motivating factor in defendants' actions. *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 861–62 (7th Cir. 2010). The defendants are entitled to qualified immunity on this claim because it was not clearly

Wis. June 9, 2014).

established at the time of the violation that the plaintiff's advocacy of Act 10 was constitutionally protected speech.[15]

In *Garcetti v. Ceballos*, the Supreme Court held that a government employee's speech is protected by the First Amendment only when "the employee [speaks] as a citizen on a matter of public concern" and when the speech is not "made pursuant to the employee's official duties." 547 U.S. 410, 418, 420–21 (2006). Speech "made pursuant to [an employee's] duties" is not protected. *Id.* at 421. In determining whether speech is pursuant to an employee's duties, I look beyond the tasks officially assigned to the employee. *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009). Rather, speech which is related to "daily professional job duties" is made pursuant to official duties. *Chrzanowski v. Bianchi*, 725 F.3d 734, 739 (7th Cir. 2013).

The plaintiff's allegations indicate that her work on Act 10 was done pursuant to her official duties as Walker's Deputy Secretary of Administration. The plaintiff alleges that "in [her] role [in the Walker administration], . . . she played a lead role in crafting policy," Am. Compl. ¶ 23; that she was "one of the top government officers in Wisconsin" and "over[saw] most departments" *id.* ¶ 24; that Walker appointed her because of her previous policy experience, *id.* ¶ 25; that she "took a lead role in

---

[15] The plaintiff argues that she also alleges retaliation based generally on her political affiliation with Scott Walker, which she argues is also constitutionally protected. However, her allegations regarding retaliation based on political affiliation are conclusory and unsupported by factual allegations. The factual allegations in the complaint support only her assertion that the defendants' retaliatory motive was based on Act 10, not a more general political motive. For example, the complaint alleges that Chisholm and his wife were angry about Act 10, Am. Compl. ¶¶ 51, 58, 61, and that the defendants did not begin their so-called "campaign of harassment" until after Act 10's proposal despite longstanding political differences, *id.* ¶ 1, 41, 67, 70. These allegations cut against an inference that the defendants retaliated based on a general political

overseeing the drafting of the legislation" including engaging in review and analysis and advising Walker and other staff, *id.* ¶ 28; and that she "became the point person for responding to Act 10-related inquiries," *id.* ¶ 29. Contrary to the plaintiff's conclusory disclaimer that her role in drafting and implementing Act 10 "was not inherent to her position," *id.* ¶ 27, the overwhelming majority of her allegations indicate that the important role that she played in drafting and implementing Act 10 was precisely because it was inherent in the high-ranking policy-making position that Walker hired her to fill. Thus, the plaintiff's work on Act 10 was done pursuant to her official duties and, if *Garcetti* applies, was unprotected.

It is unclear whether *Garcetti*'s holding that speech made pursuant to a public employee's official duties is unprotected applies in this context. *Garcetti* dealt with government employee speech in the context of alleged retaliation by a government employer. Neither the Supreme Court nor the Seventh Circuit has decided whether advocacy of the type the plaintiff engaged in is protected in the context of retaliation by a non-employer government official. See *Fairley*, 578 F.3d at 524. Other courts have reached varying conclusions. *Compare Trant v. Oklahoma*, 754 F.3d 1158, 1169 (10th Cir. 2014) (concluding *Garcetti* does not apply when defendant is not plaintiff's employer); *Leavey v. City of Detroit*, 719 F. Supp. 2d 804, 812 (E.D. Mich. 2010) (same); *Stokes v. City of Mount Vernon*, No. 11 CV 7675(VB), 2012 WL 3536461, at *7 (S.D.N.Y. Aug. 14, 2012) (same); *Price v. Roberts*, No. 10-1574, 2011 WL 1877823, at *16 (W.D. Pa. May 16, 2011) (same), *with Rowe v. Benjamin*, No. 3:12-cv-01201-JFA, 2012 WL 5306159, at *4 (D.S.C. Oct. 26, 2012) (discussing cases in which courts have

animus.

applied *Garcetti* to in non-employment contexts and concluding that "the law is at best unsettled"). I need not resolve the issue. Even assuming that *Garcetti* does not apply and plaintiff's speech was protected, the proposition was not clearly established at the time of the alleged violation.

### 3. Qualified immunity – retaliatory investigation

Defendants are also entitled to qualified immunity on the First Amendment retaliation claim for another reason: it is unclear whether a retaliatory investigation as opposed to a retaliatory prosecution rises to the level of a constitutional violation, and even if it does this was not clearly established at the time of the alleged violation. Neither the Supreme Court nor the Seventh Circuit has addressed the issue. *See Hartman v. Moore*, 547 U.S. 250, at 262 n.9 ("Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us."); *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (stating in dictum that a retaliatory investigation could be actionable under § 1983 but not analyzing the issue because "[t]he officers [did] not argue[] that the amendment [was] inapplicable").

Other circuits have come to varying conclusions. *Compare Lacey v. Maricopa Cty.*, 649 F.3d 1118, 1132 (9th Cir. 2011) (stating that "an extremely intrusive investigation that did not culminate in an arrest—even when conduct pursuant to a valid mandate—could chill the exercise of First Amendment rights"); *Izen v. Catalina*, 382 F.3d 566, 571–72 (5th Cir. 2004) (recognizing a First Amendment retaliation claim whether defendants "undertook an investigation with the substantial motivation of retaliating against" plaintiff for protected speech); *Worrell v. Henry*, 219 F.3d 1197, 1212

(10th Cir. 2000) ("Any form of official retaliation for exercising one's freedom of speech, including . . . bad faith investigation . . . , constitutes an infringement of [First Amendment] freedom."); *Pendleton v. St. Louis Cty.*, 178 F.3d 1007, 1010–11 (8th Cir. 1999) (concluding that "[d]efendants could not have reasonably believed that their actions comported with clearly established law" when they allegedly conducted a retaliatory criminal investigation), *with Rehberg v. Paulk*, 611 F.3d 828, 850 n.24 (11th Cir. 2010) ("No § 1983 liability can attach merely because the government initiated a criminal investigation."); *Colson v. Grohman*, 174 F.3d 498, 512–13 (5th Cir. 1999) (concluding that an investigation is a harm that is "not actionable under our First Amendment retaliation jurisprudence"). Thus, it was not clearly established at the time of the alleged violation that a retaliatory investigation alone violated the First Amendment.

### 4. Qualified immunity – judicial supervision

While it is unclear whether a retaliatory investigation violates the Constitution, it is even less clear whether a judicially supervised investigation, even if retaliatory in nature, does so. This is significant here because the investigation at issue was initiated and conducted in the context of a John Doe proceeding and was therefore judicially authorized and supervised. While no court has directly addressed the issue, it is likely that judicial approval defeats the plaintiff's retaliation claim. This is so because, as noted, it is generally reasonable for an officer to rely on judicial approval, and thus officers are generally entitled to qualified immunity when they do so. *Malley*, 475 U.S. at 344–45; *Leon*, 468 U.S. at 920–21. Here, every stage of the investigation was authorized by a judge—the initiation of John Doe I, each expansion of it ,and each

search conducted as part of it. Additionally, as I have already concluded, the plaintiff has failed to allege any facts to support the inference that the defendants unreasonably relied on Judge Nettesheim's authorization.

### 5.     Qualified Immunity – existence of probable cause

Further, it is likely that the existence of probable cause for the John Doe investigation defeats the plaintiff's retaliatory investigation claim because the existence of probable cause "will suggest that prosecution would have occurred even without a retaliatory motive." *Hartman,* 547 U.S. at 261, 265–66. The plaintiff's own complaint alleges sufficient probable cause for initiating and expanding John Doe I. The plaintiff alleges that Walker's chief of staff Tom Nardelli discovered that money donated by Walker's office to a charity had been stolen and that subsequently, further irregularities were discovered. Am. Compl. ¶ 70, 74. The expansion, which was based on concerns about preferential treatment in the county bidding process and which led to the search warrants involving the plaintiff, clearly resulted from information that the defendants had received. *Id.* ¶¶ 146–47 (discussing a letter notifying the defendants of potential impropriety in the bidding process). Further, as discussed, probable cause supported defendants' conduct within John Doe I including the search of the plaintiff's home. Because the defendants reasonably relied on a finding of probable cause in conducting John Doe I, they are entitled to qualified immunity on the plaintiff's First Amendment retaliation claim.

## C. False Arrest Claim

The plaintiff also alleges that defendants unlawfully detained her while searching her home in violation of the Fourth Amendment. However, officers may detain

occupants of a home while they execute a search warrant supported by probable cause. *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981). Thus, the plaintiff fails to state a claim for false arrest, and defendants are entitled to qualified immunity on this claim as well. Further, even if the warrant were invalid, it was judicially-authorized and the investigators reasonably relied on it. For the same reasons, their detention of the plaintiff was reasonable. *See Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (an officer is entitled to qualified immunity in a false arrest case when, even if the arrest was not permissible under the Fourth Amendment, a reasonable officer could have mistakenly believed that it was).[16]

## D. Retaliatory Arrest Claim

The plaintiff also claims that her detention during the search of her home was retaliatory in violation of the First Amendment. Neither the Supreme Court nor the Seventh Circuit has resolved the issue of whether a valid arrest can give rise to a retaliation claim under the First Amendment, and other circuits are split on the issue. *See id.* at 253 (discussing other circuits but not resolving the issue). Thus, even if the plaintiff's retaliatory detention claim was viable, this was not clearly established at the time of the alleged violation. *See id.* (concluding that the right was not clearly established); *see also Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (same). Thus, the investigators are entitled to qualified immunity with respect to this claim.

---

[16] The plaintiff does not allege that the prosecutor defendants played any direct role in her detention. Thus, like her claims based on the execution of the search warrants, the plaintiff has failed allege that the prosecutors defendants are personally liable for her arrest-related claims.

**E. Civil Conspiracy Claim**

Finally, the plaintiff brings a civil conspiracy claim. "Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). Inasmuch as the plaintiff's other claims fail, the plaintiff does not allege the denial of a civil right to justify her civil conspiracy claim. Thus, all the defendants are entitled to qualified immunity on this claim as well.

**F. Conclusion with Respect to Immunity**

I previously noted that the purpose of the immunity doctrine is to shield public officials from retaliatory and unfounded litigation and the threat of such litigation so that they are not impaired in doing their jobs. *Imbler*, 424 U.S. at 422–23. The concern underlying the doctrine is that if public officials are subjected to unwarranted litigation, they may shade their decisions and refrain from exercising independent judgment and taking action when they believe it is justified. *Id.* Considering the present case in light of this underlying concern leads to the conclusion that this case provides a textbook example of when immunity should be granted.

As previously discussed, the defendants in the present case pursued a public corruption investigation (John Doe I) and obtained six convictions. Evidence uncovered during the investigation led them to pursue a second public corruption investigation (John Doe II). The subjects of the investigation, however, had significant resources and were willing to bring numerous lawsuits in an attempt to shut the investigation down. It is not an overstatement to say that the opponents of the investigation made it very difficult for the defendants to proceed.

Besieging public officials with lawsuits is precisely the kind of activity that can inhibit if not intimidate an official and cause her to refrain from taking action which, however justified, might engender more lawsuits. As discussed above, based on the law, all of the defendants are entitled to either absolute or qualified immunity on all of the plaintiff's claims. I add only that the reason for the immunity doctrine, to enable public officials to do their job free from fear of being subjected to unwarranted litigation, has particular salience in the present case.

### III. Custody of Records

This case also presents a unique question regarding the materials the defendants collected during John Doe II. The state supreme court ordered the defendants to turn over all such materials (and the materials collected during John Doe I which were incorporated into John Doe II), to its clerk. *State ex rel. Three Unnamed Petitioners v. Peterson*, 365 Wis. 2d 351, 373–74 (2015). Initially, the court stated that it would to destroy the materials, but it has since indicated that it will retain them and that the parties may request access to them. *Id.* at 377.

 In her dissent, Justice Abrahamson noted that the court's handling of this issue leaves many questions unanswered, including how the court will address the interests of parties in the present case, how the parties should seek access, how long the court will maintain the materials, and even which court (the supreme court or the original John Doe court) may authorize use and dissemination of the materials. *Id.* at 417–18. Since the court issued its most recent order, the investigator defendants who were not parties to the state court proceeding have sought to intervene in that proceeding in order to ensure that they will have access to the materials for use in the present litigation.

Similarly, the prosecutor defendants have sought to intervene; Chisholm in his personal capacity and his assistants who, like the investigators, are not parties to the state court proceeding. In each instance, the state supreme court denied their request without discussion. Dec. 21, 2015 Leib Decl. Ex. 4 (ECF No. 53-5) (December 2, 2015 order denying the investigators' motion to intervene); Feb. 15, 2016 Leib Decl. Ex. 1 (ECF No. 59-1) (January 12, 2016 order denying the prosecutors' motion to intervene).

The defendants, therefore, ask me to permit them to retain custody of the John Doe II and related John Doe I materials until the present case is resolved so that they may use them in defending themselves.[17] The plaintiff opposes the request. Although I am dismissing the present case, my decision no doubt will be appealed, and while the appeal is pending the defendants will have to turn the materials over to the state supreme court unless I grant them some sort of relief. Thus, I must resolve the issue because if I do not and am reversed, the defendants will need the materials that they may no longer have access to.

The situation presents a conflict between the defendants' right to have access to evidence that they may need to defend themselves and the doctrine of comity, which cautions against undue interference with state court proceedings. I have tried to fashion a solution to the problem which ensures that the defendants will have access to the

---

[17] In my view, the materials at issue are unlikely to be relevant to the present case. They deal with materials from John Doe II, in which the plaintiff was not involved, and documents from John Doe I collected after August 10, 2012, a year after the events in the present case occurred. *See Three Unnamed Petitioners*, 365 Wis. 2d at 372–73. However, the plaintiff includes allegations about John Doe II in her amended complaint and insists that John Doe II supports her theory of an ongoing, continued conspiracy against Walker and his associates, and that these materials may, therefore, be relevant. Thus, I cannot avoid addressing the issue of custody of the records.

evidence that they need but also shows respect for the state courts. Thus I will adopt the plan that I suggested to the parties on several occasions. I will not interfere with the state supreme court's order that the defendants turn over all John Doe II and relevant John Doe I documents to its clerk. I will, however, allow the defendants, if they wish, to file copies of such documents with the clerk of this court. The clerk will not docket the materials and will maintain them under seal. When this litigation is concluded, the materials will be destroyed. I will not presently address how a party seeking to access or use the materials should go about doing so, as this question need not be answered unless my dismissal of the present case is reversed and one of the parties wants to access the materials.

This solution addresses the defendants' concerns about forever losing access to the documents by ceding control of them to the state supreme court. It also respects "the dignity" of the state supreme court and the doctrine of comity by keeping within the spirit of the court's order. *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2042 (internal quotations and citations omitted). My goal is to respect the state supreme court's interest in divesting the defendants of control of the materials while seeking to protect their rights in a way "that [does] not unduly interfere with the legitimate activities of the" state court. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10 (1987). I am not upsetting the state court's order but rather adding to it.

The plaintiff argues that I should not address the issue until after the defendants have sought and been denied access to the materials in state court. I disagree for two reasons. First, although I agree that I "should assume that state procedures will afford [defendants] an adequate remedy," *id.* at 15, the state supreme court's handling of the

access to John Doe II documents issue raises questions about whether it would grant the defendants access to relevant materials for use in the present litigation. The court has determined that all of the evidence that the prosecutors gathered has to remain secret, and it has been inflexible about that order. Thus, when a law firm with experience in Supreme Court litigation offered to represent the prosecutors pro bono in seeking certiorari review of the state supreme court's decision shutting down John Doe II, the court prevented it from doing so by refusing the prosecutors' request to allow the firm's lawyers to review the evidence. Order on Mot. to Amend John Doe Secrecy Orders, *State ex rel. Two Unnamed Petitioners v. Peterson*, No. 2014AP296-OA (Wis. Supreme Ct. Feb. 5, 2016). The court's ruling meant that the prosecutors had to file their petition pro se. Further, as discussed, the defendants have twice asked the court for permission to intervene in the state court proceeding so that they could request access to the documents, and the court summarily denied their requests. Additionally, the court has not actually agreed to allow the parties in the present case access to the materials, stating only that the documents might "potentially" be released, and the court has not set forth any procedure by which the parties could seek access to the materials. Based on the court's unwillingness to address the issue of access to documents in any meaningful way, it is entirely possible that once the defendants turn over the materials, they could permanently lose the chance to access them for use in this litigation. That said, my solution is narrowly tailored and designed to be as deferential to the court as possible, while still assuring that defendants will be able to defend themselves in the present lawsuit.

In arguing that I should not address the issue, the plaintiff relies on *Lucas v. Turner*, which dealt with whether a federal court could order state grand jury proceedings to be disclosed for use in federal civil rights litigation. 725 F.2d 1095, 1099 (7th Cir. 1984). The court stated that, in that situation, "comity dictates that the federal courts defer action on any disclosure requests until the party seeking disclosure shows that the state supervisory court has considered his request and has ruled on the continuing need for secrecy." *Id.* (internal quotations and citations omitted). "Otherwise," the court stated, "the potential threat of disclosure orders in subsequent civil litigation would seriously weaken the state court's control over the secrecy of this essential component of its criminal justice system." *Id.* (internal quotations and citations omitted). The plaintiff's argument, however, ignores the distinction between an order relating to control of materials and an order relating to their use and dissemination. My order does no more than permit the defendants to provide copies of the relevant materials to the clerk of this court. It does not address the issue of access to the materials or whether the state supreme court or this court should decide that issue. Thus, the order does not in any way weaken the state court's determination that the records should remain secret.[18]

Contrary to the plaintiff's assertion, my resolution of this issue does not violate the Anti-Injunction Act, which prohibits federal courts from "grant[ing] an injunction to

---

[18] If my dismissal of the plaintiff's suit is reversed and some John II materials are relevant to this litigation, the plaintiff may well be correct that the defendants will first have to seek permission to use the materials from the state court. Assuming that the plaintiff is correct, and the state court denies that request, the plaintiff agrees that under *Lucas*, the defendants may then ask me for an order allowing them to use the materials. The present order ensures that a copy of those materials will be available if I enter such

stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The purpose of the Anti-Injunction Act is to allow state court proceedings "to continue unimpaired by intervention of the lower federal courts." *Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970). My resolution does not impair state court proceedings in any way. To the contrary, it leaves the state court order intact. The existence of a copy of the materials filed under seal with the clerk of this court does not impair the state proceedings. And even if it did, it is within an exception to the Anti-Injunction Act because it is "necessary in aid of [my] jurisdiction." The necessary-in-aid-of-jurisdiction exception authorizes "some federal injunctive relief [when it is] necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the court's flexibility and authority to decide that case." *Id.* at 295. This exception is applicable to the present case, where the state court seeks to divest the defendants of evidence that may well be relevant to this litigation. *See Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 485 (7th Cir. 2015) (opining that the necessary-in-aid-of-jurisdiction exception may apply if, for example, "a state court were to bar a necessary witness from attending a federal trial deposition").

Further, my resolution of the issue does not violate the *Rooker-Feldman* doctrine, which prohibits federal district courts from hearing cases that directly challenge state court judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005). The *Rooker-Feldman* doctrine is narrow and applies only to "cases brought by

an order in the future.

state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 283–84. This is not such a case. The defendants do not ask me to review a state court decision, the situation which the *Rooker-Feldman* doctrine aims to avoid, and as noted, my order does not call into question any decision issued by the state court.

## IV. Motions to Seal

The parties have also filed several motions to seal in conjunction with the defendants' preservation motion. There is a presumption of public access to documents filed in federal court, and filings may only remain sealed if the parties show good cause to do so. *See City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014). Specifically, the parties have filed as exhibits documents which they originally filed with the state supreme court in John Doe II. That court sealed *sua sponte* all submissions. While I do not believe that the documents filed contain any confidential information, the Seventh Circuit has instructed that, in relation to John Doe proceedings, "Wisconsin's judiciary must decide whether particular documents . . . should be disclosed" and that "district court[s] should ensure that sealed documents in the federal record stay sealed, as long as documents containing the same information remain sealed in the state-court record." *O'Keefe*, 769 F.3d at 943. Therefore, I will grant the motions to seal.

## V. Conclusion

**THEREFORE, IT IS ORDERED** that prosecutor defendants' motion to dismiss (ECF No. 20) is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that investigator defendants' motion for judgment on the pleadings (ECF No. 36) is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that defendants' motions for order preserving evidence (ECF Nos. 49, 50) are **GRANTED in part**. Defendants may, in addition to complying with the Wisconsin Supreme Court's order regarding the John Doe 2 records, file a copy of all materials filed with the Wisconsin Supreme Court with the Clerk of Court for the Eastern District of Wisconsin. The Clerk shall not docket any of these materials and shall maintain the materials under seal until further order of this court.

**IT IS FURTHER ORDERED** that the parties' motions to seal (ECF Nos. 51, 53, 57) are **GRANTED**.

**IT IS FURTHER ORDERED** that the parties' motions to cite supplemental authority (ECF Nos. 68, 75) are **GRANTED**.

**IT IS FURTHER ORDERED** that investigator defendants' motion to supplement response to the State of Wisconsin's amicus curiae brief (ECF No. 70) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend/correct her opposition (ECF No. 72) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 26th day of May, 2016.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

AO 450 (Rev. 5/85) Judgment in a Civil Case ⊗

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

**JUDGMENT IN A CIVIL CASE**

CYNTHIA ARCHER,
      Plaintiff,

     v.                              CASE NUMBER:  15-CV-922

JOHN CHISHOLM, DAVID ROBLES,
BRUCE LANDGRAF, ROBERT STELTER,
DAVID BUDDE, and AARON WEISS,
      Defendants.

☐   **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☑   **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

     IT IS ORDERED AND ADJUDGED that plaintiff take nothing by her claims and that this case is dismissed with prejudice.

| | |
|---|---|
|     May 26, 2016 | Jon W. Sanfilippo |
| Date | Clerk |
| | s/ D. Monroe |
| | (By) Deputy Clerk |

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was served on August 2, 2016, upon the following counsel of record in this appeal by the U.S. Appeals Court's ECF system.

Joel D. Bertocchi
HINSHAW & CULBERTSON LLP
222 N. LaSalle St., Suite 300
Chicago, IL 60601-1081
(312) 704-3000

Samuel J. Leib
Douglas S. Knott
Brent A. Simerson
LEIB KNOT GAYNOR LLP
219 N. Milwaukee St., Suite 710
Milwaukee, WI 53202
(414) 276-2102

/s/    David B. Rivkin, Jr.
David B. Rivkin, Jr.